1 J. DAVID BREEMER, No. 215039
E-mail:  jdb@pacificlegal.org
2 JENNIFER F. THOMPSON, No. 280885
E-mail:  jft@pacificlegal.org
3 Pacific Legal Foundation
930 G Street
4 Sacramento, California 95814
Telephone:  (916) 419-7111
5 Facsimile:  (916) 419-7747

6 Attorneys for Plaintiffs

7

8 UNITED STATES DISTRICT COURT

9 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 SAN FRANCISCO DIVISION

11

12 DANIEL LEVIN; MARIA LEVIN; PARK LANE     )     No. 3:14-CV-03352-CRB
ASSOCIATES, L.P.; THE SAN FRANCISCO       )
13 APARTMENT ASSOCIATION; and THE          )     **PLAINTIFFS' TRIAL BRIEF**
COALITION FOR BETTER HOUSING,             )
14                                          )     Trial Date:  October 6, 2014
                          Plaintiffs,      )     Judge:  Hon. Charles R. Breyer
15                                          )     Courtroom 6, 17th Floor
                                           )
16     v.                                   )
                                           )
CITY AND COUNTY OF SAN FRANCISCO,          )
17                                          )
                          Defendant.       )
18                                          )
       and                                 )
19                                          )
DAVID GREENE and ALL OTHERS SIMILARLY      )
20 SITUATED,                                )
                                           )
21                       Intervenors.      )
22

23

24

25

26

27

28

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA  95814
(916) 419-7111 FAX (916) 419-7747

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................... iii

INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

FACTS AND PROCEDURE ...................................................... 2

    A.  Legal Background ...................................................... 2

        1.  The Ellis Act ..................................................... 2

        2.  The Rules for Withdrawing Property from the Rental Market ............ 2

        3.  The 2005 Tenant Payment Law ...................................... 4

        4.  The 2014 Ordinance and Tenant Payment Mandate ..................... 4

    B.  The Levins' Property ................................................... 7

    C.  Park Lane's Property .................................................. 8

    D.  Procedure to Date .................................................... 10

ARGUMENT .................................................................. 11

  I.  THE 2014 ORDINANCE TAKES PROPERTY FOR A PRIVATE BENEFIT AND PURPOSE, IN VIOLATION OF THE PUBLIC USE CLAUSE ............. 11

  II.  THE 2014 ORDINANCE UNCONSTITUTIONALLY TAKES AND EXACTS PRIVATE PROPERTY ............................ 12

    A.  A Facial Takings Claim Simply Asserts a Law Takes Property, and Plaintiffs' Takings and Unconstitutional Conditions Claims Are Ripe ......... 13

    B.  The Enactment of the 2014 Ordinance Physically Takes Private Property Interests .............................. 14

        1.  The Payment Is a Per Se Taking ................................... 14

        2.  The Ordinance Forces Rental Owners Who Reject the Payment To Submit to an Unconstitutional Physical Occupation of Their Property ...... 15

    C.  On Its Face, the Payment Requirement Is Not Related or Proportional to a Rental Owner's Withdrawal of Property .................... 17

        1.  *Nollan*, *Dolan*, and *Koontz* Require Heightened Scrutiny ................ 18

        2.  The Payment Is Not Connected or Proportional to the Impact of a Property Owner's Withdrawal of a Rental Property .................. 18

**Page**

III. THE 2014 ORDINANCE VIOLATES THE DUE PROCESS
CLAUSE AND THE FOURTH AMENDMENT'S PROTECTION
AGAINST UNREASONABLE SEIZURES ................................. 20

    A. The Ordinance's Retroactive Aspect Violates the Due Process Clause ......... 20

    B. The Ordinance Authorizes an Unreasonable Seizure ....................... 21

IV. THE 2014 ORDINANCE VIOLATES THE ELLIS ACT ...................... 22

CONCLUSION ........................................................... 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4 *Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

5 *Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

6 *Bullock v. City & County of San Francisco*, 221 Cal. App. 3d 1072 (1990) . . . . . . . . . . . . . 23

7 *Commercial Builders of N. Cal. v. City of Sacramento*, 941 F.2d 872 (9th Cir. 1991) . . . . . . 17

8 *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159 (3d Cir. 2006) . . . . . . . . . . . . . . 20

9 *Cwynar v. City & County of San Francisco*, 90 Cal. App. 4th 637 (2001) . . . . . . . . . . . . . . 16

10 *Dolan v. City of Tigard*, 512 U.S. 374 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 19-20

11 *Eastern Enters. v. Apfel*, 524 U.S. 498 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13-14, 20-21

12 *F.C.C. v. Fla. Power Corp.*, 480 U.S. 245 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

13 *Garneau v. City of Seattle*, 147 F.3d 802 (9th Cir 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

14 *Guggenheim v. City of Goleta*, 638 F.3d 1111 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 13-14

15 *Horne v. U.S. Dep't of Agric.*, 750 F.3d 1128 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 17

16 *In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

17 *Kaiser Aetna v. United States*, 444 U.S. 164 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827 (1990) . . . . . . . . . . . . . . . . . . 21

19 *Kelo v. City of New London*, 545 U.S. 469 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

20 *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987) . . . . . . . . . . . . . . . 13

21 *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586 (2013) . . . . 11-12, 14-15, 17-18

22 *Landgraf v. USI Film Prod.*, 511 U.S. 244 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

23 *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . 13

24 *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) . . . . . . . . . . . . . . 15-17

25 *New Jersey v. T.L.O.*, 469 U.S. 325 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

26 *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) . . . . . . . . . . . . . . . . . . . . 12, 15, 17-18

27 *Parks v. Watson*, 716 F.2d 646 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

28 *Patel v. City of Los Angeles*, 738 F.3d 1058 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 20

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

Page

*Patsy v. Fla. Bd. of Regents*, 457 U.S. 496 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Pieri v. City & County of San Francisco*, 137 Cal. App. 4th 886 (2006) . . . . . . . . . . . 1, 12, 23

*Reidy v. City & County of San Francisco*, 123 Cal. App. 4th 580 (2004) . . . . . . . . . . . . . . . 23

*Ross v. City of Berkeley*, 655 F. Supp. 820 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 16

*San Remo Hotel L.P. v. City & County of San Francisco*, 27 Cal. 4th 643 (2002) . . . . . . . . . 23

*San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323 (2005) . . . . . . . . . . 14

*Schneider v. Cal. Dep't of Corrections*, 345 F.3d 716 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . 15

*Seawall Assoc. v. City of New York*, 542 N.E.2d 1059 (N.Y. 1989) . . . . . . . . . . . . . . . . . . . . 16

*Soldal v. Cook Cnty.*, 506 U.S. 56 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . 13-14

*United States v. Jacobsen*, 466 U.S. 109 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) . . . . . . . . . . . . . . . . . 21

*Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835 (9th Cir. 2001) . . . . . . . . . . 14

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980) . . . . . . . . . . . . . . . . . 15

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank
   of Johnson County*, 473 U.S. 172 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Yee v. City of Escondido*, 503 U.S. 519 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

**Statutes**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

Cal. Gov't Code §§ 7060-7060.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   § 7060 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

   § 7060(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   § 7060.1(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22

   § 12926 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   § 12955.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5-7, 9

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1

Page

2
## San Francisco Administrative Code

3
S.F. Admin. Code § 37.9(a)(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-3, 18, 14

4
§ 37.9A(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5
§ 37.9A(a)(1)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

6
§ 37.9A(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7
§ 37.9A(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8
§ 37.9A(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

9
§ 37.9A(e)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10
§ 37.9A(e)(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

11
§ 37.9A(e)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

12
§ 37.9A(e)(3)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

13
§ 37.9A(e)(3)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4-5, 14, 19

14
§ 37.9A(e)(3)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 11

15
§ 37.9A(e)(3)(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16
§ 37.9A(e)(3)(G)(ii) & (iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

17
§ 37.9A(e)(3)(G)–(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

18
§ 37.9A(e)(3)(H) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

19
§ 37.9A(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

20
§ 37.9A(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21
§ 37.9A(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22
§ 37.9A(f)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

23
## United States Constitution

24
U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

25

26

27

28

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA  95814
(916) 419-7111  FAX (916) 419-7747

1                                                                                          **Page**

2                                            **Miscellaneous**

3   Callies, David L. & Breemer, J. David, *The Right to Exclude Others*
        *from Private Property:  A Fundamental Constitutional Right*,
4       3 Wash. U. J.L. & Pol'y 39 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

5   Sandefur, Timothy, *The Timing of Facial Challenges*, 43 Akron L. Rev. 51 (2010) . . . . . . .   13

6   Woodward, Scott, *The Remedy for a "*Nollan/Dolan *Unconstitutional*
        *Conditions Violation,"* 38 Vt. L. Rev. 701 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

P ACIFIC L EGAL F OUNDATION
930 G Street
Sacramento, CA  95814
(916) 419-7111 FAX (916) 419-7747

**INTRODUCTION AND SUMMARY OF ARGUMENT**

This case challenges a San Francisco ordinance that requires rental property owners, like Daniel and Maria Levin (Levins), to pay off their tenants before the City will allow the owners to cease renting their property. The ordinance, San Francisco Administrative (S.F. Admin.) Code Section 37.9A(e)(3)(E) (2014 Ordinance), requires rental owners to pay their tenants the difference between the tenant's current monthly, rent-controlled rate and the rate it would take the tenant to rent a similar unit on the open market, multiplied by 24 months (Payment). In essence, the law requires rental owners to subsidize two years of the tenant's rents in San Francisco, one of the most costly places to live.

The required Payment can be, and often is, extraordinarily expensive. It requires the Levins to pay more than $117,000 to a single tenant before the Levins can take exclusive possession of a one-bedroom unit. Stipulation to Facts For Trial on Facial Claims (Stipulation to Facts) at 13 ¶ 62. It requires Park Lane Associates, L.P. (Park Lane) to make payments of more than a million dollars to take possession of its building, including a payment of $223,782.25 to one tenant. Stipulation to Facts at 15 ¶ 75. The 2014 Ordinance does not make the Payment contingent on tenant need and the tenant can use the Payment for any purpose. The payment obligation is retroactive, immediately binding owners, like the Levins, who withdrew property before the Ordinance was even passed. If a property owner objects to the taking of money and its transfer to tenants under the 2014 Ordinance, City law compels the owner to submit to the continued occupation of the property by the tenant.

Given these effects, the Ordinance cannot be reconciled with the United States Constitution. The law violates the Takings Clause of the Fifth Amendment in several ways. First, because the Payment "would directly benefit tenants, not society at large," *Pieri v. City & County of San Francisco*, 137 Cal. App. 4th 886, 893 n.5 (2006), it violates the Fifth Amendment's Public Use Clause. The Payment mandate violates the Takings Clause even if it serves a "public use," because it immediately and automatically appropriates the Levins' money, or coerces them to acquiesce to continued tenant occupation of their property. Further, the Payment mandate violates the takings Unconstitutional Conditions Doctrine because it is not reasonably related to the

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1   displacement of a tenant by withdrawal of property from the market.  For similar reasons, the 2014

2   Ordinance exceeds the City's Ellis Act authority.  Due to its unreasonable and retroactive nature,

3   the law also violates the Fourth Amendment's guarantee against unreasonable seizures of property

4   and the Due Process Clause.

5        Ultimately, the law fails not so much because it seeks to help tenants, but because it forces

6   a relative few rental owners to shoulder the general societal burden of solving housing issues by

7   compelling the owners to donate their property.  The result is law that is a invalid under the

8   Constitution and the Ellis Act.

9                                    **FACTS AND PROCEDURE**

10  **A.   Legal Background[1]**

11       **1.   The Ellis Act**

12       In 1985, the California legislature enacted Cal. Gov't Code Sections 7060-7060.7, known

13  as the "Ellis Act."  The Act's initial provision recognizes and protects the right of rental property

14  owners to go out of the landlord business, stating "[n]o public entity . . . shall, by statute,

15  ordinance, or regulation, or by administrative action implementing any statute, ordinance or

16  regulation, compel the owner of any residential real property to offer, or to continue to offer,

17  accommodations in the property for rent or lease . . . ."  Cal. Gov't Code § 7060(a).  The Ellis Act

18  also makes clear that nothing in the Act "[d]iminishes or enhances any power in any public entity

19  to mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or lease

20  of any accommodations."  *Id.* § 7060.1(c).  S.F. Admin. Code Section 37.9(a)(13) implements

21  Section 7060 of the Ellis Act.  It states that a landlord may evict tenants if the landlord

22       wishes to withdraw from rent or lease all rental units within any detached physical
         structure and, in addition, in the case of any detached physical structure containing
23       three or fewer rental units, any other rental units on the same lot, and complies in
         full with Section 37.9A with respect to each such unit . . . .

24

25       **2.   The Rules for Withdrawing Property from the Rental Market**

26       S.F. Admin. Code Section 37.9A(f) establishes a procedure for rental property owners

27

28  ___

[1]  All the legal background facts are taken from, and consistent with, the parties' Stipulation to
    Facts for Trial on Facial Claims (Stipulation to Facts), pp. 1-12.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1  seeking to withdraw units from the rental market under the Ellis Act and S.F. Admin. Code Section

2  37.9(a)(13).  First, a withdrawing property owner must serve a Notice of Termination of Tenancy

3  on its tenants. It must then file a Notice Intent to Withdraw Rental Units (Notice of Withdrawal)

4  with the City Rent Board.  The Notice contains information about the subject property and any

5  tenants who reside in it.  The owner must later record "a memorandum of the [Notice of

6  Withdrawal] summarizing its provisions, other than the confidential provisions."  S.F. Admin.

7  Code § 37.9A(f)(2).

8      A rental unit is deemed to be withdrawn from the market 120 days after the filing of the

9  Notice of Withdrawal.  S.F. Admin. Code § 37.9A(f)(4).  However, a tenant in a unit to be

10  withdrawn can extend the effective date of withdrawal to a *year* from the filing of the Notice of

11  Withdrawal if the tenant is "at least 62 years of age or disabled as defined in Government Code

12  section 12955.3,[2] and has lived in his or her unit for at least one year prior to the date of delivery

13  to the Rent Board of the [Notice of Withdrawal]."  S.F. Admin. Code § 37.9A(f)(4).

14      Once a property owner files a Notice of Withdrawal, the owner's ability to re-rent the

15  property becomes restricted.  First, "[i]f a unit [withdrawn from the market] is offered for rent or

16  lease within two years of the date of withdrawal," "[t]he owner shall be liable to any tenant or

17  lessee who was displaced from the property for actual and exemplary damages," and the City "may

18  institute a civil proceeding against the owner who has again offered the unit for rent or lease, for

19  exemplary damages for displacement of tenants or lessees."  S.F. Admin. Code § 37.9A(d).

20  Second, if a property owner seeks to re-rent a unit within five years after filing the Notice, the unit

21  can only be rented at the rate in place when the Notice was filed, whether tenants change or not.

22  S.F. Admin. Code § 37.9A(a)(1).  This restriction eviscerates, for five years, a withdrawing

23  ///

24  ///

25

26  [2]  Under Section 12955.3 of the California Government Code, " 'disability' includes, but is not
    limited to, any physical or mental disability as defined in [Cal. Gov't Code] Section 12926."
27  Under Section 12926, "Physical disability" includes any physical "condition" or "disorder" that
    makes a "Major Life Activity" "difficult," with "Major life activities" "broadly construed" to
28  include "physical, mental, and social activities and working."

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1  property owner's normal right to raise rents to open market rates when a unit becomes vacant.[3]

2  Third, and finally, a property owner who seeks to re-rent a unit within ten years after it was

3  withdrawn must generally attempt to first offer the unit to the former tenant. S.F. Admin. Code

4  § 37.9A(c). Under the City code, the City must record a Notice of Constraints memorializing the

5  foregoing re-rental restrictions "[w]ithin 30 days after the effective date of withdrawal." S.F.

6  Admin. Code § 37.9A(f)(6).

7      **3.  The 2005 Tenant Payment Law**

8      In 2005, the City enacted S.F. Admin. Code Section 37.9A(e), entitled "Relocation

9  Payments to Tenants" (2005 Ordinance). This law required property owners withdrawing from

10  the rental market after February 20, 2005, to make a "relocation payment" to any tenants displaced

11  by the withdrawal. The 2005 Ordinance specifically stated: "each tenant shall be entitled to

12  receive **$4,500.00**, one-half of which shall be paid at the time of the service of the notice of

13  termination of tenancy, and one-half of which shall be paid when the tenant vacates the unit." S.F.

14  Admin. Code § 37.9A(e)(3)(A) (emphasis added). "In the event there are more than three tenants

15  in a unit," the 2005 Ordinance required a total payment of "$13,500.00 . . . divided equally by the

16  number of tenants in the unit." *Id.* § 37.9A(e)(2)(C).

17      The 2005 Ordinance further provides that

18      any tenant who, at the time the [Notice of Withdrawal] is filed with the Board, is
    62 years of age or older, or who is disabled within the meaning of Section 12955.3

19      of the California Government Code, shall be entitled to receive an additional
    payment of **$3,000.00**, $1,500.00 of which shall be paid within fifteen (15) calendar

20      days of the landlord's receipt of written notice from the tenant of entitlement to the
    relocation payment, and $1,500.00 of which shall be paid when the tenant vacates

21      the unit.

22  *Id.* § 37.9A(e)(2)(D) (emphasis added). The 2005 Ordinance mandates that the foregoing tenant's

23  "relocation payments . . . shall increase annually at the rate of increase in the 'rent of primary

24  residence' expenditure category of the Consumer Price Index (CPI)." *Id.* § 37.9A(e)(3)(D).

25      **4.  The 2014 Ordinance and Tenant Payment Mandate**

26      On June 1, 2014, the City enacted S.F. Admin. Code Section 37.9A(e)(3)(E), the 2014

27

28  [3] This five-year rate restriction applies "whether or not the [Notice of Withdrawal] is rescinded
or the withdrawal of the units is completed." S.F. Admin. Code § 37.9A(a)(1)(A)(i).

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1   Ordinance at issue here, to increase the "relocation payment" that rental property owners must

2   make to tenants before the owners can complete an Ellis Act withdrawal. The 2014 Ordinance

3   specifically states that each tenant displaced by the withdrawal of units from the rental market

4   under the Ellis Act "shall be entitled to the <u>greater</u> of:

5         (i)     the payment specified in Subsections 37.9A(e)(3)(A)–(D) [i.e., the
      2005 Ordinance]; or

7         (ii)    <u>an amount equal to the difference between the unit's rental rate at
      the time the landlord files the notice of intent to withdraw rental units with the
      Board, and the market rental rate for a comparable unit in San Francisco as
      determined by the Controller's Office, multiplied to cover a two-year period, and
      divided equally by the number of tenants in the unit (the "Rental Payment
      Differential"). The landlord shall pay one-half of the Rental Payment Differential
      at the time of the service of the notice of termination of tenancy, and the remaining
      one-half when the tenant vacates the unit.</u>

11  *Id.* § 37.9A(e)(3)(E) (emphasis added).

12      The purpose of the Ordinance is to mitigate the "affordability crisis" so  tenants can pay

13  the high rents in San Francisco and continue to live there.  *See* Trial Exhibit 16 (Transcript of

14  Board of Supervisors Land Use Committee, March 17, 2014), pp. 1-14; Trial Exhibit 18

15  (Transcript of Board of Supervisors Meeting, April 1, 2014), pp. 1-2; Trial Exhibit 19 (Transcript

16  of Board of Supervisors Meeting, April 8, 2014), pp. 29-31.  In introducing the ordinance,

17  Sponsoring Supervisor Campos stated that San Francisco" has the highest rents in the country . . .

18  [and]  the current [2005] relocation is not sufficient to allow people to stay if they are evicted."

19  Trial Exhibit 18, pp. 1-2.  He explained that the 2014 Ordinance "ensures that relocation payments

20  adequately represent . . . the true market costs and . . . allow tenants to have the opportunity to

21  actually have a fighting chance to stay in San Francisco."  *Id; see also,* Stipulation to Facts for

22  Trial on Facial Claims ¶ 48.

23      The 2014 Payment mandate applies not only to future Ellis Act withdrawals but also to

24  "[a]ny tenant who has [already] received a notice of termination of tenancy, but who has not yet

25  vacated the unit by June 1, 2014 . . . ."  S.F. Admin. Code § 37.9A(e)(3)(F).  The 2014 Ordinance

26  requires landlords to give the Payment to such tenants when they vacate the unit—"reduced by any

27  payment the tenant has received under [the 2005 Ordinance]."  *Id.*  Any displaced tenant entitled

28  to a Payment under the 2014 Ordinance, and who is disabled within the meaning of Section

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1   12955.3 of the California Government Code or over  62 years of age, remains entitled to the

2   additional $3,000 (plus annual CPI increases) payment authorized by the 2005 Ordinance.

3     A "Rental Payment Differential Schedule" (Schedule) created by the City Controller's

4   Office calculates the precise amount of the Payment that landlords utilizing the Ellis Act must

5   make to tenants under the 2014 Ordinance.  In general, the Schedule sets higher Payments for

6   longer-term tenants.  According to the current Schedule, whose accuracy is not in question here,[4]

7   the 2014 Ordinance requires an Ellis Act withdrawing property owner to pay up to several hundred

8   thousand dollars to tenants.

9     Nothing in the 2014 Ordinance constrains, conditions, or hinders a tenant's personal use

10  of a Payment received from an Ellis Act-withdrawing property owner under the 2014 Ordinance.

11  The  law includes no income requirement for a tenant to be eligible to receive a Payment.  Answer

12  at 1 ¶ 3.

13    Under the 2014 Ordinance, a property owner may seek a hearing with the City Rent Board

14  if the owner believes the Payment obligation "would constitute an undue financial hardship for a

15  landlord in light of all of the resources available to the landlord."  S.F. Admin. Code

16  § 37.9A(e)(3)(G)–(I).  If a property owner requests, and the Rent Board grants, a Hardship

17  Adjustment hearing,

18  > the Board, or its designated Administrative Law Judges, shall consider all relevant
19  > factors, including the number of units in the building and any evidence submitted
    > regarding the landlord's age, length of ownership of the building, ownership of any
    > other buildings, income, expenses, other assets, debt, health, and health care costs,
20  > except . . . a. Assets held in retirement accounts; and b. Non-liquid personal
    > property.[5]

21

22  *Id.* § 37.9A(e)(3)(G)(ii) & (iii).

23

---

24  [4] S.F. Admin. Code Section 37.9A(e)(3)(H) provides landlords with a procedure to contest the
    Rental Payment Differential Schedule, if the landlord believes it is inaccurate.  Plaintiffs do not
25  contest the Schedule in this case, and that procedure is not in issue.

26  [5]  The provision requires a landlord to make a Hardship Adjustment Request "on a form provided
    by the Rent Board . . . with supporting evidence.  S.F. Admin. Code § 37.9A(e)(3)(G).  The Board,
27  or its designated Administrative Law Judges, may order a reduction, payment plan, or any other
    relief they determine is justified following a hearing on the request."  The City has produced a
28  form for such a hearing.  *See* Trial Exhibit 11.

---

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

## B.   The Levins' Property

In 2008, the Levins purchased a two-story house located at 471-473 Lombard Street, in the North Beach area near their business. *See* Answer at 7 ¶ 39. In 2013, the Levins moved into the top floor of the house.  It is a small, one-bedroom unit.  The bottom unit remained occupied by a tenant who had moved into the unit in 1988.  Stipulation to Facts at 12 ¶¶ 51-54.

In late 2013, the Levins decided to withdraw their property from the rental market under the Ellis Act so they could use the entirety of their house for their own purposes, including for having family and friends stay in the lower unit.  Accordingly, on December 16, 2013, they filed a Notice of Withdrawal.  Answer at 7 ¶ 43.  The tenant paid a rent of $2,479.67 at that time. *Id.* at 7 ¶ 41.  On the same day, the Levins served a Notice of Termination of Tenancy on their tenant. *Id.*  On January 29, 2014, the Levins recorded a Memorandum regarding the withdrawal with the County Recorder's Office.  Stipulation to Facts at 12-13 ¶¶ 55, 58.

The 2005 Ordinance in effect when the Levins filed their Notice of Withdrawal required the Levins to give their tenant a $5,210.91 "relocation payment" to complete the withdrawal of the Property, half being due with the Notice of Termination of Tenancy.  Therefore, when the Levins sent the Notice to the tenant on December 16, 2014, they included a check in the amount of $2,605.46.  Answer at 7 ¶ 43; Stipulation to Facts 12 at ¶ 55.  The tenant subsequently claimed to be disabled "within the meaning of Section 12955.3 of the California Government Code," entitling the tenant to an additional payment in the amount of $3,473,93 and extending the date of withdrawal of the unit from the market until December 16, 2014.  Answer at 8 ¶ 44.  The Levins decided not to contest the tenant's claims or the one-year extension on withdrawal. *Id.*  Therefore, within 15 days of the tenant's claim, they paid the tenant one-half of the disability bonus of $3,473,93.  To date, the Levins have paid the tenant a total of $6,079.39.  Stipulation to Facts at 13 ¶¶ 56-57.

On April 30, 2014, the City recorded a Notice of Constraints on the Levins' property.  Answer at 8 ¶ 49.  This Notice confirmed the pending withdrawal of the property from the rental market, and made clear that, once withdrawal occurs, legal impediments restrict re-rental of the property. *Id.*; Stipulation to Facts at 13 ¶ 59.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1  As of June 1, 2014, the Levins' tenant had not vacated their property.  Therefore, the

2  Levins became subject to the 2014 Ordinance's Payment mandate.  *Id.* at 2 ¶ 6.  Based on the

3  tenant's monthly rent of $2,479.67, *id.* at 7 ¶ 41, and move in date of 1988, the 2014 Ordinance

4  requires the Levins to pay their tenant **$117,958.89** to complete withdrawal of their property.  *Id.*

5  at 2 ¶ 4, *id.* at 9 ¶ 51.  Stipulation to Facts at 13 ¶¶ 61-62.

6  To date, the Levins' tenant has still not vacated the property.  But under the Notice of

7  Withdrawal, Notice of Termination and Rent Code, the tenant must do so by December 16, 2014,

8  the effective date of the Levins' Ellis Act withdrawal.  The moment the tenant leaves, the

9  Ordinance obligates the Levins to give the tenant the $117,958.89 Payment.  S.F. Admin. Code

10  § 37.9(a)(13); *id.* § 37.9A(e)(3)(F).  The Levins fear and object to the required Payment.  But

11  taking into account "all the resources available to them," including their property and their

12  business, the Levins do not qualify for, and have not claimed, an "undue financial Hardship

13  Adjustment."  Stipulation to Facts at 14 ¶ 64.  The City admits the Levins do not qualify for a

14  "Financial Hardship reduction."  Answer at 9 ¶ 53.

15  The City also recognizes that if the Levins do not make the Payment due under the 2014

16  Ordinance, the withdrawal of their property from the market will fail, they will have to accede to

17  continued occupation of the property by a tenant, and will be bound to rent the unit at a rent

18  controlled rate (rather than increasing the rent to market value) if it becomes vacant within the next

19  five years.  *Id.* at 8 ¶ 50.

20  **C.   Park Lane's Property**

21  Park Lane owns and manages[6] a 33-unit building located at 1100 Sacramento Street,

22  San Francisco, in the Nob Hill District (the Property).  Answer at 9 ¶ 54; Stipulation to Facts at 14

23

24  [6]  The Intervenor's attorney has leveled charges of mismanagement against Park Lane.  To this point, Park Lane has refrained from responding because the accusations are unwarranted and irrelevant here.  But Park Lane now feels compelled to briefly describe the situation.  Four of Park

25  Lane's tenants (including Intervenor's attorney) are upset that Park Lane has been renovating its building while they still live there, and have filed suit on this ground in state court.  The conflict

26  arises from the fact that, after Park Lane filed its Notice of Withdrawal in October, 2013, some tenants extended their tenancy to a year after that filing.  But other units became vacant long before

27  that year was up, and many were in fact Ellis Act-withdrawn in February, 2014.  As a result, tenants in the extended tenancy units have been in Park Lane's building while Park Lane has had

28  to renovate the vacant and now withdrawn units (and the building to some degree) for sale.

¶ 65.   In 2013, Park Lane decided to convert the building into a Tenancy-In-Common (TIC) ownership system under which the units could be sold rather than rented.  Answer at 9 ¶ 55.

Park Lane accordingly moved to withdraw the units in the Property from the rental market under the Ellis Act.  On October 22, 2013, Park Lane served a Notice of Termination on its tenants.  On October 24, 2013, Park Lane filed its Notice of Withdrawal, serving all tenants with a copy. *Id.* at 9-10 ¶¶ 58-59; Stipulation to Facts at 14 ¶¶ 67-69.  At this time, 15 of Park Lane's units were vacant and 18 were tenant-occupied.  Answer at 9-10 ¶ 58.  Many tenants in the occupied units claimed to be over 62 or "disabled" within the meaning of Government Code Section 12955.3 and on this basis, extended the date of withdrawal for their particular units to a year from the filing of the Notice of Withdrawal.  *Id.* at 10 ¶ 61;[7] Stipulation to Facts at 14  ¶ 70.

The 2005 Ordinance in effect when Park Lane filed its Notice of Withdrawal required Park Lane to give each tenant displaced by its Ellis Act withdrawal a $5,210.91 payment, except for two units that had more than three tenants (in that case, the total payment was $13,500.00, divided equally by the tenants in the unit).  As required, Park Lane paid its tenants half of the relocation payments then due—a total of $88,585.55—upon serving the Notices of Termination.  Answer at 10 ¶ 60; Stipulation to Facts 14 at ¶ 69.

Under the 2005 Ordinance, Park Lane was required to give an additional $3,473.93 payment to tenants claiming to be "disabled" within the meaning of Government Code Section 12955.3 or over 62.  Park Lane timely made these payments, paying out a total additional amount of $43,424.65.  Answer at 10 ¶ 61; Stipulation to Facts at 15 ¶ 71.

On November 13, 2013, Park Lane recorded a Memorandum regarding the withdrawal of its units.  Stipulation to Facts at 15 ¶ 72.  On April 2, 2014, the City recorded two Notice of Constraints on Park Lane's Property.  *Id.* at 10-11 ¶ 67.  The first Notice applied to the units that were vacant when Park Lane filed its Notice of Withdrawal.  It confirmed the withdrawal of those units was effective on February 21, 2014, and that the units are now subject to legal restraints that

---

[7]  This meant that the units that were vacant when Park Lane filed its Notice would be withdrawn 120 days from the filing of the Notice, in February, 2014, while most occupied units would not be withdrawn until October 24, 2014.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA  95814
(916) 419-7111 FAX (916) 419-7747

limit their re-rental.  The second Notice of Constraints confirms Park Lane's Notice to Withdraw its tenant-occupied units and that certain restrictions constrain re-rental of those units once they are withdrawn.  Stipulation to Facts at 15 ¶ 73.

As of June 1, 2014, tenants in 13 units had not vacated Park Lane's Property.  Stipulation to Facts at 15 ¶ 74.  The 2014 Ordinance therefore applied to Park Lane with respect to these tenants.  *Id*; Answer at 2-3 ¶ 7.  Today, approximately ten (10) of Park Lane's units are still tenant-occupied.

According to the City's Rent Payment Schedule, which Park Lane does not contest, the 2014 Ordinance requires Park Lane to pay **$223,782.25** to a tenant who began renting a unit in San Francisco in 1997 and who is paying a monthly rental rate of $8,470.44.  Park Lane must pay **$156,313.73** to a tenant who began renting a unit in 1970 and pays a monthly rent of $2,398.48.  Park Lane must also pay **$154,874.38** to tenants that moved in in 2001 and pay a current monthly rent of $8,076.4.  All told, under the 2014 Ordinance, Park Lane must pay more than a million dollars to its remaining tenants to complete withdrawal of the units from the rental market.  Answer at 10 ¶ 66; Stipulation to Facts at 15 ¶¶ 75-76.

All of Park Lane's remaining tenants must vacate the Property by October 24, 2014.  As soon as a tenant vacates, the Ordinance obligates Park Lane to give the tenant the Payment. Answer at 10 ¶ 66.  The City recognizes that if Park Lane does not make the Payment due under the 2014 Ordinance, the withdrawal of its units from the market will fail, it will have to accede to continued occupation of the property by tenants, and if the unit becomes vacant within the next five years, will be bound to rent the unit at a rent-controlled rate (rather than increasing the rent to market value).  *Id.* at 11 ¶ 68.

Park Lane does not qualify for, and has not sought, a Financial Hardship reduction under S.F. Admin. Code § 37.9A(e)(3)(G)–(I).  Stipulation to Facts at 16 ¶ 77.  The City admits that it does not qualify for such relief.  Answer at 11 ¶ 69.

**D.   Procedure to Date**

On July 24, 2014, Plaintiffs filed a complaint against the City arising from its enactment of the 2014 Ordinance.  DE 1.  The complaint raises facial and as-applied constitutional claims

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1   under 42 U.S.C. § 1983, including takings and due process claims and a Fourth Amendment claim.

2   It also raises a claim under the Ellis Act.  The Court has stayed the as-applied claims and set the

3   facial claims for trial.

**ARGUMENT**

**I**

**THE 2014 ORDINANCE TAKES PROPERTY
FOR A PRIVATE BENEFIT AND PURPOSE,
IN VIOLATION OF THE PUBLIC USE CLAUSE**

8       The Takings Clause limits not only uncompensated takings but also those not for a "public

9   use." U.S. Const. amend. V.  That is, it forbids the government from taking property for a private

10  purpose.  *Kelo v. City of New London*, 545 U.S. 469, 477 (2005).  The money taken from rental

11  owners through the 2014 Ordinance is "property" that is protected by the Takings Clause.  *Koontz*

12  *v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2599-2601 (2013) (holding that a

13  governmental demand for a discreet sum of money that "operate[s] upon . . . an identified property

14  interest" is subject to Takings Clause. *See also Eastern Enters. v. Apfel*, 524 U.S. 498, 540 (1998)

15  (Kennedy, J., concurring)).  And the 2014 Ordinance unquestionably appropriates constitutionally

16  protected sums of money from rental owners. Indeed, this taking is immediate with respect to

17  owners, like the Levins and Park Lane, who filed to withdraw their properties prior to the

18  Ordinance.  S.F. Admin. Code § 37.9A(e)(3)(F).

19      The only question is whether the transfer of money from landlords to tenants is for a public

20  or private purpose.[8]  The Public Use Clause bars the government from taking property to give it

21  to another private person:  "[t]he sovereign may not take the property of *A* for the sole purpose of

22  transferring it to another private party *B*."  *Kelo*, 545 U.S. at 477.  A taking serves a private

23  purpose when it is "for the purpose of conferring a private benefit on a particular private party."

24  *Id.*  While a rational basis-type analysis governs this issue, such an approach "does not . . . alter

25  the fact that transfers intended to confer benefits on particular, favored private entities, and with

26

27  ───────────────
    [8]  A Public Use takings claim is not subject to any state court exhaustion or ripeness barriers,
    *Armendariz v. Penman*, 75 F.3d 1311, 1320-21 & n.5 (9th Cir. 1996) (en banc), and the City does
28  not claim otherwise.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

only incidental or pretextual public benefits, are forbidden by the Public Use Clause." *Kelo*, 545 U.S. at 490 (Kennedy, J., concurring).  "A court applying rational-basis review under the Public Use Clause should thus strike down a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits . . . ."  *Id.* at 491 (Kennedy, J., concurring); *see also*, *id.* at 497 (O'Connor, J., dissenting) ("Government may [not] compel an individual to forfeit her property . . . for the benefit of another private person.").

The 2014 Ordinance cannot withstand these basic Public Use standards because it requires a direct transfer of money from property owners like the Levins to particular private parties—their tenants—for the tenants' benefit.  Tenants can  use the Payment for any personal desire they wish—cars, debts, travel, or lawyers.  The City, of course, believes (or hopes) tenants will choose to use the funds to pay for new, private housing.  But even if one defers to this belief, the Payment is still "intended to favor a particular private party [the tenant], with [at most] only incidental or pretextual public benefits."  *Kelo*, 545 U.S. at 491 (Kennedy, J., concurring).  Indeed, the City has identified no public benefit arising from the requirement that private citizen landlords pay private tenants enough money to allow the tenants to live in San Francisco (as opposed to other cheaper places), or buy other private goods.  Instead, in a pending state court case dealing with the ordinance at issue here, the City conceded that the Payment "*would directly benefit tenants, not society at large*."  Trial Exhibit 33, at 10-12; *see also*, *Pieri*, 137 Cal. App. 4th at 893 n.5 (emphasis added) (same).  This is fatal.  *Kelo*, 545 U.S. at 491 (Kennedy, J., concurring).  Enactment of the law takes Plaintiffs' property for an impermissible private purpose. *Id.*

## II

### THE 2014 ORDINANCE UNCONSTITUTIONALLY TAKES AND EXACTS PRIVATE PROPERTY

If the Ordinance serves a public use, it still violates the Takings Clause on its face by physically taking property without just compensation.  Alternatively, it violates the Unconstitutional Conditions Doctrine in the takings context, as that doctrine is articulated in *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz*, 133 S. Ct. 2586.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

## A.   A Facial Takings Claim Simply Asserts a Law Takes Property, and Plaintiffs' Takings and Unconstitutional Conditions Claims Are Ripe

Before proceeding to the merits, it is important to briefly review the facial takings standard and a ripeness issue. Generally, a "plaintiff who argues that a law is facially invalid is claiming that the law is not, and never can be, applied in a way that satisfies constitutional restrictions." Timothy Sandefur, *The Timing of Facial Challenges*, 43 Akron L. Rev. 51, 53 (2010). However, facial takings challenges are subject to a different standard. *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir. 1993) ("different rules adhere in the facial takings context and other contexts"). Specifically, the issue in a facial takings challenge is simply whether "the mere enactment of a statute constitutes a taking" of the claimant's property. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494 (1987). " 'In the takings context, the basis of a facial challenge is that the very enactment of the statute has reduced the value of the [plaintiff's] property or has effected a transfer of a property interest.' " *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1119 (9th Cir. 2010) (en banc) (quoting *Levald*, 998 F.2d at 688). Thus, the test for a facial takings challenge is not whether the challenged law has any constitutional (non-takings) application, but whether passage of the law itself takes the plaintiff's property. *Levald*, 998 F.2d at 688; *Keystone*, 480 U.S. at 496-502.

There is no jurisdictional impediment to Plaintiffs' facial claims. Plaintiffs do not need to exhaust administrative remedies before bringing their takings claims in federal court. *Patsy v. Fla. Bd. of Regents*, 457 U.S. 496 (1982); *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson County*, 473 U.S. 172, 192-93 (1985). Moreover, Plaintiffs did not need to unsuccessfully seek compensation in state courts pursuant to *Williamson County*, 473 U.S. at 194-96, to ripen their claims. Takings claims that target a legislative demand for money, such as those here, are ripe without a prior damages suit. *Eastern Enters.*, 524 U.S. at 521 (ripeness not applicable where " 'the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds' " to the government) (quoting *In re Chateaugay Corp.*, 53 F.3d 478, 493 (2d Cir. 1995)). It "would entail an utterly pointless set of activities" to require a plaintiff to pay money demanded by challenged legislation and then go seek "one for one" dollar reimbursement

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1   before challenging the law as a taking.  *Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 401

2   (D.C. Cir. 1997); *see also*, *In re Chateaugay Corp.*, 53 F.3d at 493.

3       *Williamson County*'s ripeness doctrine also does not apply to takings claims that do not

4   seek and do not hinge on monetary compensation.  *San Remo Hotel, L.P. v. City & County of San*

5   *Francisco*, 545 U.S. 323, 345-46 (2005) (facial takings claims were instantly ripe because they

6   "requested relief distinct from the provision of 'just compensation' "); *Yee v. City of Escondido*,

7   503 U.S. 519, 533-34 (1992) (same).  Here, Plaintiffs have appropriately sought injunctive and

8   declaratory relief, rather than post-takings monetary compensation.  *See Eastern Enters.*, 524 U.S.

9   at 521, *and Brown v. Legal Found. of Wash.*, 538 U.S. 216, 228-29 (2003); *Wash. Legal Found.*

10  *v. Legal Found. of Wash.*, 271 F.3d 835, 846 (9th Cir. 2001) (en banc); Scott Woodward, *The*

11  *Remedy for a* "*Nollan/Dolan Unconstitutional Conditions Violation,*" 38 Vt. L. Rev. 701 (2014).

12  Therefore, *Williamson County* is inapplicable.  *Yee*, 503 U.S. at 533-34.

13  **B.   The Enactment of the 2014 Ordinance**
        **Physically Takes Private Property Interests**

14

15      The City does not dispute that the 2014 Ordinance requires property owners to pay tenants

16  enough money to subsidize two years of the tenant's rental expenses on the open market or allow

17  the tenant to continue occupying the property.  *Compare* S.F. Admin. Code § 37.9(a)(13)

18  (Allowing an owner to stop renting property if the owner "complies in full with <u>Section 37.9A</u> with

19  respect to each such unit . . . .") (underline added) *with* S.F. Admin. Code § 37.9A(e)(3)(E)

20  (requiring an owner invoking § 37.9(a)(13) to make the Payment to the tenant).  Since both options

21  take property, the 2014 Ordinance is facially unconstitutional.

22      **1.   The Payment Is a Per Se Taking**

23      A per se takings standard determines whether the 2014 Ordinance causes a taking in

24  demanding that the Levins and other property owners transfer their money to tenants.  The

25  Supreme Court has repeatedly held that a per se approach governs a taking of money related to a

26  traditional property interest, like real property.  *Koontz*, 133 S. Ct. at 2600; *Brown*, 538 U.S. at 235.

27  In *Brown*, the Court adopted a "per se" takings analysis for a takings claim challenging the

28  government-mandated transfer of monetary interest from one party to another, concluding that "the

transfer of the interest . . . seems more akin to the occupation [and physical taking] of a small amount of rooftop space in *Loretto*." *Brown*, 538 U.S. at 235. *Koontz* recently confirmed the per se standard for money takings tied to real property. *Koontz*, 133 S. Ct at 2600 ("[W]hen the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, a '*per se* [takings] approach' is the proper mode of analysis.") (quoting *Brown*, 538 U.S. at 235).

Here, there is no question that the Payment requirement "commands the relinquishment of funds linked to a specific, identifiable property interest such as a . . . parcel of real property." *Koontz*, 133 S. Ct at 2600. As a result, the requirement is judged under the per se approach. *Brown*, 538 U.S. at 235. Under that approach, the only question is whether the Payment requirement in the 2014 Ordinance confiscates property. The Ordinance forces all rental property owners to whom it applies to relinquish their money. It immediately appropriates the Levins' and Park Lane's funds based on their prior acts to withdraw property. This is a taking. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980); *Schneider v. Cal. Dep't of Corrections*, 345 F.3d 716, 721-22 (9th Cir. 2003) (confiscation of interest on inmate funds was a per se taking).

### 2. The Ordinance Forces Rental Owners Who Reject the Payment To Submit to an Unconstitutional Physical Occupation of Their Property

The 2014 Ordinance gives rental property owners only one way out of the per se money taking it causes: they must allow an unwanted tenant to remain in their property. But this too causes a per se taking, this time, of the rental owner's property interests.

A real property owner's right to take exclusive possession of property is a fundamental constitutional right. *Nollan*, 483 U.S. at 831; *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 433 (1982); *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). The Ellis Act confirms the right of exclusion at the state level by recognizing that California property owners may go out of the rental business and take sole possession of their property. Cal. Gov't Code § 7060. The right to exclude others from real property is so important that it is distinctly and independently protected by the Takings Clause. *Dolan*, 512 U.S. at 409 (Stevens, J., dissenting);

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1   David L. Callies & J. David Breemer, *The Right to Exclude Others from Private Property:  A*

2   *Fundamental Constitutional Right*, 3 Wash. U. J.L. & Pol'y 39 (2000).  Thus, a governmental

3   denial of the right to exclude and related authorization of an occupation of private property is a

4   per se physical taking.  *Loretto*, 458 U.S. at 435-37, 440.

5           Deprivations of a property owner's right to exclude that arise from rent control schemes

6   are not immune from the strict per se takings framework.  On the contrary, when regulations

7   effectively force a property owner to accede to the unwanted occupation of property by a tenant,

8   a taking results.  In *Yee*, for example, the Supreme Court repeatedly indicated that rent control

9   regulations cause a physical taking if they compel a property owner to continue renting property.

10  503 U.S. at 527-28, 532.  The Court said essentially the same thing in *Loretto*.  458 U.S. at 440

11  ("[S]o long as these regulations do not require the landlord to suffer the physical occupation of a

12  portion of his building by a third party, they will be analyzed under the multifactor inquiry

13  generally applicable to nonpossessory governmental activity.").  Perhaps even more to the point

14  is *Cwynar v. City & County of San Francisco*, 90 Cal. App. 4th 637 (2001), in which the California

15  Court of Appeal held that City rent regulations effectively barring property owners from evicting

16  tenants could cause a physical taking.  *Id.* at 653-59.

17          Other jurisdictions, including this one, have also concluded that laws coercing property

18  owners to submit to continued occupation of their property by a tenant cause a per se taking.  *Ross*

19  *v. City of Berkeley*, 655 F. Supp. 820, 836-42 (N.D. Cal. 1987) (regulation that precluded owner

20  from taking possession of commercial property from a tenant was a physical taking); *Seawall*

21  *Assoc. v. City of New York*, 542 N.E.2d 1059, 1064 (N.Y. 1989) ("[L]oss of possessory interests,

22  including the right to exclude, resulting from tenancies coerced by the government would

23  constitute a per se physical taking.").  Ultimately, the presence of an unconstitutional denial of the

24  right to exclude hinges on the "element of required acquiescence" to occupation of property.

25  *F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 251-53 (1987).  That element is fully present in the

26  2014 Ordinance.  The Ordinance requires rental owners to acquiesce to occupation of their

27  property by an unwanted tenant, and to forfeit their federal and state right to exclusively possess

28  their property, unless they make the Payment.  The City does not dispute this.

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

Thus, the 2014 Ordinance either takes rental property owners' money or their real property. It is no answer to say that the taking is permissible because the victims chose to rent in the first place. "[A] landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Loretto*, 458 U.S. at 439 n.17. Even closer to home, the government may not use the past rental of property as an excuse to manipulate away "[t]he right of a property owner to exclude a stranger's physical occupation of his land." *Id.*; *see also*, *Dolan*, 512 U.S. at 394.

**C.   On Its Face, the Payment Requirement Is Not Related or Proportional to a Rental Owner's Withdrawal of Property**

If the 2014 Ordinance survives traditional, per se takings tests, it is invalid under the Unconstitutional Conditions Doctrine.   In the takings context, that doctrine prohibits the government from using its regulatory authority to coerce people into giving up the constitutional right to be free from an uncompensated taking of property. *Koontz*, 133 S. Ct. at 2594.   The controlling precedent is *Nollan*, 483 U.S. 825, and *Dolan*, 512 U.S. 374.

Ninth Circuit precedent permits facial-type challenges to ordinances and statutes based on *Nollan* and *Dolan*. *See, e.g.*, *Horne v. U.S. Dep't of Agric.*, 750 F.3d 1128, 1141-44 (9th Cir. 2014) (applying *Nollan* and *Dolan* to the terms of a Marketing Order); *Commercial Builders of N. Cal. v. City of Sacramento*, 941 F.2d 872 (9th Cir. 1991) (adjudicating a facial *Nollan*-based claim against an ordinance requiring developers to provide affordable housing). *Garneau v. City of Seattle*, 147 F.3d 802 (9th Cir 1998), is not to the contrary. *Garneau* expressed concerns with a *Dolan* claim; but it did not reject *Nollan* facial claims, and instead implicitly accepts them, *id.* at 811.   Moreover, the *Garneau* court disallowed a *Dolan* facial claim only because the particular claim in *Garneau* required the court to consider the exact amount of a monetary exaction to determine if the exaction met the *Dolan* "rough proportionality" test. *Id.*   In contrast, here (as shown below), Plaintiffs' *Dolan* claim does not hinge on specific dollar amount exacted by the Payment, but rather on the nature and terms of the Payment demand itself.   Therefore, *Garneau* does not preclude the *Dolan* portion of Plaintiffs' facial claim.

*///*

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1.   ***Nollan*, *Dolan*, and *Koontz* Require Heightened Scrutiny**

In *Nollan*, the Court limited the government's ability to exact property as a condition on the use of property.  The Court held that if an exaction of property would be a taking if the government simply ordered the owner to hand over the property, there must be an "essential nexus" between the exaction and the impact of the property use before the exaction may be imposed as a property condition.  *Nollan*, 483 U.S. at 833-37.  *Dolan* added that an exaction must be roughly proportionate in nature and extent to the impact of a property use.  512 U.S. at 391. And in the recent *Koontz* decision, the Court made clear that *Nollan*'s and *Dolan*'s rules apply to conditions that exact money from property owners.  *Koontz*, 133 S. Ct. at 2599-2601.  This framework requires heightened judicial scrutiny of subject property exactions.  *Id.* at 2604 (Kagan, J., dissenting).

2.   **The Payment Is Not Connected or Proportional to the Impact of a Property Owner's Withdrawal of a Rental Property**

The Payment condition violates *Nollan* and *Dolan* because it is not related or proportionate, in either nature or extent, to the impact of a property owner's withdrawal of units from the rental market.  As demonstrated above, an outright governmental demand that property owners hand over their savings is a per se taking.  *Koontz*, 133 S. Ct. at 2599-2600.  Therefore, if the Payment mandate in the 2014 Ordinance is a condition on the use of property, it is subject to *Nollan* and *Dolan*.  *Id.* at 2599.

In applying the *Nollan* "nexus" test, it is important to correctly identify the public problem the subject exaction is intended to address.  *Nollan*, 483 U.S. at 839-43.  Here, the Payment mandate is intended to help mitigate the high rents in the city, so tenants can afford to stay and live in the City after a rental unit has been withdrawn. Trial Exhibit 18 (Transcript of Board of Supervisors Meeting, April 1, 2014), pp. 1-2; Trial Exhibit 19 (Transcript of Board of Supervisors Meeting, April 8, 2014), pp.29-31. The problem with this is that the withdrawal of rental property does not cause the rental affordability problem addressed by the Payment.  As City officials acknowledged when considering the law, San Francisco's high rental prices are caused by larger, pre-existing economic forces.  Trial Exhibit 16 (Transcript of Board of Supervisors Land Use

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1   Committee, March 17, 2014) (Supervisor Wiener:  "[W]e must address the deep structural

2   problems in our housing market . . . we've shot ourselves in the foot by not producing housing as

3   our population has grown, and we have put ourselves in a position where the average rent is over

4   $3,000.").  The City's Budget and Legislative Analyst found, in a report prepared in connection

5   with the 2014 Ordinance, that (1) "*[i]ncreased employment and population in San Francisco and*

6   *minimal increases in new housing since 2010 has contributed to the upward pressure on rental*

7   *rates*," and (2) "[t]he Citywide *vacancy rate has decreased* from 6.4 percent in 2009 to 2.8 percent

8   in 2012, *contributing to the pressure on rental rates*.  San Francisco's Response to Court's Order

9   to File Legislative History for San Francisco Admin. Code §§ 37.9A(e)(3) and 37.9A(e)(3)(E)(ii),

10  Exhibit C, p. 4 [DE 44-3, at 5] (emphasis added).  It is these larger forces, not the withdrawal of

11  property by the Levins'—or any other owners—that has caused the city's steadily rising rents and

12  the tenant "affordability crisis."  There is accordingly no "nexus" between the Payment and the

13  impact of withdrawal of property from the market.  *See, e.g.*, *Parks v. Watson*, 716 F.2d 646, 652-

14  53 (9th Cir. 1983) (invalidating a land use condition that had no relation to impacts arising from

15  a developer's planned vacation of city streets).

16          Even if there is a connection between the Payment and the impact of withdrawing property

17  from the market, the Payment exaction fails because it is not roughly proportionate "in nature and

18  extent to the impact."  *Dolan*, 512 U.S. at 391 (emphasis added).  The only arguably direct impact

19  of withdrawal is that tenants need to find a new place to live.[9]  The Payment mandate is not

20  proportionate in *nature* to such an impact because the Payment need not be used for housing or

21  rent.  *Id.* at 395.  As *Dolan* found, an exaction that "could" mitigate a problem is not sufficiently

22  proportional in its nature.  *Id.*

23          The Payment requirement is also not proportionate in *extent* to the impact of withdrawal

24  on tenants, *i.e.*, the need to find a new place to live, because it requires landlords to subsidize two

25  years of tenant rents.  The Payment does not simply fund the physical relocation of displaced

---

[9]  It is doubtful that withdrawal of property from the market could even be considered the cause of a tenant's need to relocate.  By definition, a tenant is one who does not own property, who occupies another's property under a temporary lease, and who must accordingly expect to relocate at some point due to the choice to be a tenant.

1  tenants; it subsidizes their housing for 24 months.  *See, e.g.*, *Dolan*, 512 U.S. at 393 (finding a

2  public access easement exaction to be disproportionate to the potential flooding impact of a new

3  hardware store given that the problem could have been mitigated by a private, conservation

4  easement condition).  The difference for landlords is tens of thousands of dollars and potentially,

5  the inability to go out of the rental business.  There is no basis in the record or in logic for

6  believing withdrawal of property from the rental market directly causes a tenant's need to cover

7  high rents for two years (or for any amount of time).  The tenant's need to rent for any amount of

8  time is independent of the withdrawal event and arises from a personal choice to rent and to live

9  in San Francisco, while the high prices the tenant faces flow from macro-economic forces.

10      It should be noted that the foregoing conclusions do not depend on the precise amount of

11  money the 2014 Ordinance exacts in particular cases. Regardless of the specific amounts, the

12  "differential" Payment requirement demanding two years of subsidized rents lacks a sufficiently

13  close relationship to the impact of an owner withdrawing property from the market.  Therefore, on

14  its face, the Payment mandate fails *Nollan* and *Dolan* and the Unconstitutional Conditions

15  Doctrine.

16                                      **III**

17           **THE 2014 ORDINANCE VIOLATES THE DUE**
      **PROCESS CLAUSE AND THE FOURTH AMENDMENT'S**
18        **PROTECTION AGAINST UNREASONABLE SEIZURES**

19      In the Due Process context, a facial challenge depends on whether a law, on its own terms,

20  irrationally or illegitimately deprives those subject to the law of protected property interests.

21  *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006).  The facial Fourth

22  Amendment question is whether the challenged law authorizes an unreasonable seizure (or search)

23  in all instances.  *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061-64 (9th Cir. 2013).

24  **A.   The Ordinance's Retroactive Aspect Violates the Due Process Clause**

25      The Due Process Clause protects individuals from being deprived of protected property

26  interests.  Money is protected property, *Eastern Enters.*, 524 U.S. at 547-48 (Kennedy, J.,

27  concurring), and there is no dispute that the Payment mandate deprives rental property owners of

28  that property interest.  Therefore, the only real question here is whether the deprivation is arbitrary

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1    or irrational.

2        The retroactive nature of the Ordinance calls for a stronger form of rational basis than in

3    other contexts.  Because "[r]etroactivity is generally disfavored in the law," *Eastern Enters.*, 524

4    U.S. at 532 (citing *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990))

5    (Scalia, J., concurring), courts treat due process challenges against retroactive laws "as serious and

6    meritorious, thus confirming the vitality of our legal tradition's disfavor of retroactive economic

7    legislation." *Eastern Enters.*, 524 U.S. at 548 (Kennedy, J., concurring).  In short, a robust form

8    of rational basis scrutiny applies to due process challenges implicating retroactivity. *Id.*; *id.* at 547

9    (Kennedy, J., concurring).

10       Here, the Ordinance reaches back and imposes the Payment requirement on rental owners

11   who acted to withdraw units before enactment of the 2014 Ordinance, if their tenants remain.  Prior

12   to the Ordinance, withdrawing rental owners were legally required to pay tenants about $5,200.

13   The 2014 Ordinance suddenly and dramatically increased the liability of those who withdrew under

14   this prior regime.  Enactment of the 2014 Ordinance increased the Levins' liability from $8684.85

15   to $117,958.89.  The basis for this new monetary liability is not the presence of a tenant, but the

16   owners' past conduct; i.e., a pre-Ordinance decision to withdraw units.  The 2014 Ordinance is

17   therefore retroactive. *Id.* at 280 (A law has retroactive effect if it would "increase a party's liability

18   for past conduct, or impose new duties with respect to transactions already completed.").

19       The record shows no rational or legitimate reason for the portion of the 2014 Ordinance that

20   makes the law retroactive to those who completed the steps to withdraw property from the market

21   under prior, less burdensome laws.  *Landgraf v. USI Film Prod.*, 511 U.S. 244, 265 (1994)

22   ("Elementary considerations of fairness dictate that individuals should have an opportunity to

23   know what the law is and to conform their conduct accordingly; settled expectations should not

24   be lightly disrupted.").

25   **B.   The Ordinance Authorizes an Unreasonable Seizure**

26       The 2014 Ordinance also offends the Fourth Amendment's Seizure Clause.  That clause

27   applies in the civil context. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 51-52

28   (1993).  Further, the Amendment's prohibition on unreasonable seizures applies to seizures that

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1    occur outside the context of a criminal search.  *Soldal v. Cook Cnty.*, 506 U.S. 56, 65-68 (1992).

2    A suspect "seizure" arises when "there is some meaningful interference with an individual's

3    possessory interests in [] property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Whether

4    the seizure is reasonable depends on a "'careful balancing of governmental and private interests.'"

5    *Soldal*, 506 U.S. at 549 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)).

6         In this case, the 2014 Ordinance interferes not only with rental owners' possession of their

7    money, but also with their real property interests.  On the plain face of the law, it forces them to

8    hand over substantial sums of money, or acquiesce to the physical occupation of their property.

9    The seizure of the owners' money is unreasonable because it takes significant private interests in

10   an illegitimate and unfair and retroactive fashion.  As designed to fund a tenant's high rents for two

11   years, the Payment demand is unrelated and disproportionate to the impact of the withdrawal of

12   property from the rental market.  The governmental interest in the seizure is weak given that it

13   funds tenants' purely private housing needs, and in fact can be used for any private purpose.  The

14   payment impedes rental owners' fundamental (and state law protected) right to make their property

15   truly private by excluding others from the property.  There is no instance in which the Ordinance

16   could apply without seizing rental owners' money (or requiring them to accede to occupation of

17   their property) and without doing in the unreasonable ways just described.  Therefore, the 2014

18   Ordinance is facially invalid under the Fourth Amendment.

19                                              **IV**

20                    **THE 2014 ORDINANCE VIOLATES THE ELLIS ACT**

21        The Ellis Act states that nothing in the Act "[d]iminishes or enhances any power in any

22   public entity to mitigate any adverse impact on persons displaced by reason of the withdrawal from

23   rent or lease of any accommodations."  Cal. Gov't Code § 7060.1(c).  Therefore, the 2014

24   Ordinance's Payment requirement violates the Act if it exceeds the mitigation authority generally

25   available to the City under the law.

26   ///

27   ///

28   ///

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA 95814
(916) 419-7111 FAX (916) 419-7747

1    In *San Remo Hotel L.P. v. City & County of San Francisco*, 27 Cal. 4th 643 (2002), a

2  property owner raised a takings challenge under the state constitution[10] against a law requiring

3  payment of a fee to mitigate the impact of conversion of a hotel from residential to tourist use.  The

4  California Supreme Court held that "[a]s a matter of both [state] statutory and constitutional law,

5  such fees must bear a reasonable relationship, in both intended use and amount, to the deleterious

6  public impact of the development." *Id.* at 671.  Therefore, the Payment requirement here is outside

7  the City's authority and violates the Ellis Act if it lacks a "reasonable relationship" in "intended

8  use" and "amount" to the impact of property owners' withdrawal of property from the rental

9  market.  *San Remo*, 27 Cal. 4th at 671; *see also*, *Pieri*, 137 Cal. App. 4th at 893 ("[A] requirement

10  of *reasonable* relocation assistance compensation for displaced tenants does not violate the Ellis

11  Act.") (emphasis added).  Absent the required reasonable relationship between the Payment and

12  withdrawal of rental property, the Payment is simply an illegal "ransom" demand.  *Bullock v. City*

13  *& County of San Francisco*, 221 Cal. App. 3d 1072, 1099-1102 (1990).

14    As outlined in preceding sections, the Payment mandate bears no reasonable relationship

15  to the impact of the withdrawal of property.  First, the withdrawal of property is not reasonably

16  related to the "intended use" of the Payment—for tenants to afford high San Francisco

17  rents—because withdrawal does not cause the high rent problem.  Further, the "amount" of the

18  Payment—two years of subsidized rents—is not reasonably related to the only potential impact

19  that withdrawal of rental property may have:  the need for tenants to move.  Therefore, the

20  Payment is beyond the City's mitigation powers under California law,[11] and its implementation

21  reflects an "enhanced" power that is "inimical" to the Ellis Act.  *Reidy v. City & County of*

22  *San Francisco*, 123 Cal. App. 4th 580, 587 (2004).

23  ///

24  ///

25

26  [10] The *San Remo* plaintiffs did not raise a federal takings claim in the California Supreme Court proceedings.

27  [11] Plaintiffs note that the Payment even more clearly exceeds the City's authority under the
28  heightened scrutiny of *Nollan*/*Dolan*, and that the Payment is outside the City's Ellis Act powers under that line of authority, as well as under California law.

1

**CONCLUSION**

2      The Court should enjoin the 2014 Ordinance as facially unconstitutional and invalid.

3      DATED:  September 15, 2014.

4                                         Respectfully submitted,

5                                         J. DAVID BREEMER
                                          JENNIFER F. THOMPSON
6

7                                         By _____ /s/ J. David Breemer _____
                                                  J. DAVID BREEMER
8

9                                         Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACIFIC LEGAL FOUNDATION
930 G Street
Sacramento, CA  95814
(916) 419-7111 FAX (916) 419-7747