1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  WAYNE SNODGRASS, State Bar #148137
   CHRISTINE VAN AKEN, State Bar #241755
3  Deputy City Attorneys
   1 Dr. Carlton B. Goodlett Place
4  City Hall, Room 234
   San Francisco, California 94102-4682
5  Telephone:    (415) 554-4633
   Facsimile:    (415) 554-4699
6  E-Mail:       christine.van.aken@sfgov.org

7  Attorneys for Defendant
   CITY AND COUNTY OF SAN FRANCISCO

8

9

10                  UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12  DANIEL LEVIN; MARIA LEVIN; PARK         Case No. 14-cv-03352-CRB (JSC)
    LANE ASSOCIATES, L.P.; THE SAN
13  FRANCISCO APARTMENT                     **DEFENDANT CITY AND COUNTY OF SAN**
    ASSOCIATION; and THE COALITION FOR      **FRANCISCO'S TRIAL BRIEF**
14  BETTER HOUSING,
                                            Judge: Hon. Charles R. Breyer
15            Plaintiffs,

16            vs.                           Trial Date:        October 6, 2014

17  CITY AND COUNTY OF SAN
    FRANCISCO,
18
              Defendant.
19

20  DAVID GREENE AND ALL OTHERS
    SIMILARLY SITUATED,
21
              Intervenors.
22

23

24

25

26

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

I.     SAN FRANCISCO FACES A HOUSING AFFORDABILITY CRISIS .............. 3

II.    THE 2014 MITIGATION ORDINANCE WAS ADOPTED TO EASE THE HARMS OF EVICTION AND HELP DISPLACED TENANTS REMAIN IN SAN FRANCISCO ................................................................................................ 5

III.   THE 2014 MITIGATION ORDINANCE WILL RESULT IN A WIDE RANGE OF PAYMENTS TO TENANTS ........................................................................ 6

ARGUMENT ................................................................................................................... 7

I.     THE 2014 MITIGATION ORDINANCE SERVES A LEGITIMATE PUBLIC PURPOSE ......................................................................................................... 7

II.    THE 2014 MITIGATION ORDINANCE IS NOT A FACIALLY UNCONSTITUTIONAL EXACTION ................................................................ 11

    A.   *Garneau v. City of Seattle* Forecloses Plaintiffs' Facial Claims ............... 12

    B.   A Legislatively Imposed Condition Is Not Analyzed Under *Nollan/Dolan* .......................................................................................... 14

    C.   Mitigation Payments to Evicted Tenants Will Be Roughly Proportional To The Adverse Impacts Of Eviction ....................................................... 16

    D.   San Francisco Can Directly Compel Tenant Payments, So The *Nollan/Dolan* Test Does Not Apply ...................................................... 17

III.   PLAINTIFFS' PER SE TAKING CLAIMS FAIL ............................................ 17

    A.   Taking Money Is Not A Per Se Taking ..................................................... 18

    B.   The Mitigation Ordinance Does Not Take Owners' Rights To Possess Their Rental Units ................................................................................... 19

IV.   PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS FAIL ..................... 21

V.    PLAINTIFFS' ELLIS PREEMPTION CLAIMS FAIL ..................................... 22

VI.   PLAINTIFFS' PER SE AND EXACTIONS TAKINGS CLAIMS ARE UNRIPE .......................................................................................................... 25

VII.  INJUNCTIVE RELIEF IS NOT AVAILABLE TO REMEDY A TAKING WITHOUT JUST COMPENSATION ................................................................ 25

# **TABLE OF AUTHORITIES**

**Federal Cases**

*ABN 51st St. Partners v. City of New York*
    724 F.Supp. 1142 (S.D.N.Y. 1989) ...........................................................8

*Action Apartment Ass'n v. Santa Monica Rent Control Bd.*
    509 F.3d 1020 (9th Cir. 2007) ...........................................................8, 10

*Berman v. Parker*
    348 U.S. 26 (1954) ...........................................................7, 9

*Brown v. Legal Fdn. of Wash.*
    538 U.S. 216 (2003) ...........................................................19

*Carson Harbor Village, Ltd. v. City of Carson*
    37 F.3d 468 (9th Cir. 1994) ...........................................................12, 14

*Colony Cove Props., LLC v. City of Carson*
    640 F.3d 948 (9th Cir. 2011) ...........................................................14, 20

*Concrete Pipe & Products of California, Inc.*
    *v. Constr. Laborers Pension Trust for S. California*
    508 U.S. 602 (1993) ...........................................................22

*Dolan v. City of Tigard*
    512 U.S. 374 (1994) ........................................................... *passim*

*Eastern Enterprises v. Apfel*
    524 U.S. 498 (1998) ...........................................................18, 19

*Equity Lifestyle Props. v. County of San Luis Obispo*
    548 F.3d 1184 (9th Cir. 2007) ...........................................................25

*F.C.C. v. Florida Power Corp.*
    480 U.S. 245 (1987) ...........................................................20

*Garneau v. City of Seattle*
    147 F.3d 802 (9th Cir. 1998) ...........................................................12, 13, 14

*Goldstein v. Pataki*
    516 F.3d 50 (2d Cir. 2008) ...........................................................9

*Guggenheim v. City of Goleta*
    638 F.3d 1111 (9th Cir. 2010) ...........................................................17, 25

*Harmon v. Markus*
    412 F.App'x 420 (2d Cir. 2011) ...........................................................20

*Hart v. Massanari*
 266 F.3d 1155 (9th Cir. 2001) ...................................................................13

*Haw. Housing Auth. v. Midkiff*
 467 U.S. 229 (1984)..................................................................1, 7, 9, 10, 11

*Heller v. Doe*
 509 U.S. 312 (1993).................................................................................11

*Horne v. U.S. Dep't of Agriculture*
 750 F.3d 1128 (9th Cir. 2014) ...................................................16, 18, 19

*Hotel & Motel Ass'n of Oakland v. City of Oakland*
 344 F.3d 959 (9th Cir. 2003) ...................................................................14

*Kawaoka v. City of Arroyo Grande*
 17 F.3d 1227 (9th Cir. 1994) ...................................................................21

*Kelo v. City of New London*
 545 U.S. 469 (2005)..............................................................................1, 9

*Koontz v. St. Johns River Water Mgmt. Dist.*
 133 S.Ct. 2586 (2013)..................................................................14, 15, 19

*Lair v. Bullock*
 697 F.3d 1200 (9th Cir. 2012) .................................................................14

*Landgraf v. USI Film Products*
 511 U.S. 244 (1994).................................................................................22

*Levald, Inc. v. City of Palm Desert*
 998 F.2d 680 (9th Cir. 1993) ......................................................11, 14, 21

*Lingle v. Chevron U.S.A. Inc.*
 544 U.S. 528 (2005)...............................................................................9, 18

*Loretto v. Teleprompter Manhattan CATV Corp.*
 458 U.S. 419 (1982).................................................................................20

*McClung v. City of Sumner*
 548 F.3d 1219 (9th Cir. 2008) ...........................................................14, 15

*Metropolis Theatre Co. v. Chicago*
 228 U.S. 61 (1913)...................................................................................11

*MHC Financing Ltd. P'ship v. City of San Rafael*
 714 F.3d 1118 (9th Cir. 2013) *cert. denied,*
 134 S. Ct. 900 (U.S. 2014).................................................................11, 17

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*
 503 U.S. 407 (1992)...............................................................................7, 9

*Nollan v. California Coastal Commission*
    483 U.S. 825 (1987) .................................................................................. *passim*

*Pennell v. City of San Jose*
    485 U.S. 1 (1988) .......................................................................................... 8

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*
    467 U.S. 717 (1984) ..................................................................................... 22

*Richardson v. City & County of Honolulu*
    124 F.3d 1150 (9th Cir. 1997) ............................................................... 10, 21

*Ruckelshaus v. Monsanto Co.*
    467 U.S. 986 (1984) ..................................................................................... 25

*Sadowsky v. City of New York*
    732 F.2d 312 (2d Cir. 1984) ......................................................................... 8

*Surf & Sand, LLC v. City of Capitola*
    377 F. App'x 662 (9th Cir. 2010) ............................................................... 25

*Surf & Sand, LLC v. City of Capitola*
    717 F.Supp.2d 934 (N.D. Cal. 2010) .......................................................... 25

*Sylvia Landfield Trust v. City of Los Angeles*
    729 F.3d 1189 (9th Cir. 2013) ..................................................................... 21

*Thompson v. Consol. Gas Utils. Corp.*
    300 U.S. 55 (1937) ......................................................................................... 7

*United States v. Gettysburg Elec. R. Co.*
    160 U.S. 668 (1896) ....................................................................................... 7

*United States v. Riverside Bayview Homes, Inc.*
    474 U.S. 121 (1985) ..................................................................................... 25

*United States v. Rodriguez-Preciado*
    399 F.3d 1118 (9th Cir. 2005) ..................................................................... 14

*United States v. Sperry Corp.*
    493 U.S. 52 (1989) ....................................................................................... 19

*Usery v. Turner Elkhorn Mining Co.*
    428 U.S. 1 (1976) ......................................................................................... 22

*Wash. Legal Fdn. v. Legal Fdn. of Wash.*
    271 F.3d 835 (9th Cir. 2001) ....................................................................... 25

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*
    449 U.S. 155 (1980) ..................................................................................... 19

*Williamson County Planning Comm'n v. Hamilton Bank*
    473 U.S. 172 (1985)..................................................................................25

*Yee v. City of Escondido*
    503 U.S. 519 (1992)..............................................................................17, 20

**State Cases**
*Assn. of Cal. Ins. Companies v. Poizner*
    180 Cal.App.4th 1029 (2009) ...................................................................23

*Bullock v. City & County of San Francisco*
    221 Cal.App.3d 1072 (1990) ...............................................................14, 24

*Channing Properties v. City of Berkeley*
    11 Cal.App.4th 88 (1992) .........................................................................24

*Drouet v. Superior Court*
    31 Cal.4th 583 (2003) ................................................................................3

*Greater Atlanta Homebuilders Ass'n v. DeKalb Cnty.*
    588 S.E.2d 694 (Ga. 2003) ........................................................................15

*Javidzad v. City of Santa Monica*
    204 Cal.App.3d 524 (1988) .......................................................................24

*Kavanau v. City of Santa Monica*
    16 Cal.4th 761 (1997) ...............................................................................25

*Krupp v. Breckenridge Sanitation Dist.*
    19 P.3d 687 (Colo. 2001) ..........................................................................15

*Pieri v. City & Cnty. of San Francisco*
    137 Cal.App.4th 886 (2006) ...........................................................8, 10, 22, 23

*Reidy v. City & County of San Francisco*
    123 Cal.App.4th 580 (2004) ......................................................................24

*Rogers Mach., Inc. v. Washington Cnty.*
    45 P.3d 966 (Or. Ct. App. 2002)................................................................15

*San Remo Hotel L.P. v. City & County of San Francisco*
    27 Cal.4th 643 (2002) ...............................................................................15

*St. Clair Cnty. Home Builders Ass'n v. City of Pell City*
    61 So.3d 992 (Ala. 2010)...........................................................................15

**Federal Statutes**
42 U.S.C. § 4624(a) ........................................................................................8

42 U.S.C. § 4626(a) ........................................................................................8

42 U.S.C. § 4626(b) ................................................................................................8

**State Statutes, Codes & Regulations**

Cal. Gov. Code §§ 7060, et seq. (The Ellis Act) ................................................. *passim*

Cal. Gov't Code § 7060(a) ......................................................................................23

Cal. Gov. Code § 7060.1(c) ...........................................................................10, 23

Cal. Gov. Code § 7264(b) ........................................................................................8

Cal. Gov. Code § 7264.5(a) ......................................................................................8

Cal. Gov. Code § 7264.5(b) ......................................................................................8

**San Francisco Statutes, Codes & Ordinances**

S.F. Admin. Code § 37.2(r)(5) ..................................................................................3

S.F. Admin. Code § 37.3(a) ......................................................................................3

S.F. Admin. Code § 37.3(a)(1) ..................................................................................3

S.F. Admin. Code § 37.9 ...........................................................................................3

S.F. Admin. Code § 37.9(a)(13) ..............................................................................18

S.F. Admin. Code § 37.9A(e)(3) ...............................................................................5

S.F. Admin. Code § 37.9A(e)(3)(E) ..........................................................................5

S.F. Admin. Code § 37.9A(e)(3)(E)(ii) .....................................................................5

S.F. Admin. Code § 37.9A(e)(3)(F) ..........................................................................6

S.F. Admin. Code § 37.9A(e)(3)(G) ....................................................................5, 24

S.F. Admin. Code § 37.9A(e)(3)(H) ....................................................................5, 17

**INTRODUCTION**

San Francisco faces a housing affordability crisis. Rents and sales prices are higher than ever, and evictions are on the rise. These evictions disproportionately affect San Francisco's most vulnerable tenants, who lose the protections of rent control and must find new housing in an overheated market, or must leave San Francisco.

San Francisco's policymakers have decided that this should not be a city only for the rich. Instead, they have determined to preserve the social fabric of San Francisco's neighborhoods by protecting tenants evicted pursuant to the Ellis Act, a state law that permits landlords to exit the residential rental business. Those tenants are now entitled to a payment that will mitigate one of the many adverse impacts they face as a consequence of eviction: their exposure to high market rents.

Plaintiffs cast that as an irrational taking of their property. But it is well established that protecting tenants from high rents is a legitimate public purpose; that a payment of money is not a per se taking except in circumstances not present here; and that the government is permitted to require private parties to mitigate the consequences of their actions. On a facial challenge, Plaintiffs simply cannot succeed in showing that the ordinance is invalid in all of its applications, as they must to succeed. This Court should enter judgment in San Francisco's favor on Plaintiffs' facial claims.

**SUMMARY OF ARGUMENT**

1.      Plaintiffs allege that the 2014 Mitigation Ordinance serves private purposes rather than public purposes. But it is well established that protecting tenants from high rental prices, and protecting neighborhood stability, are legitimate public purposes. This Court is required to defer to the Legislature's judgment both about the desirability of serving a particular public purpose and about whether the means chosen are effective. The fact that the ordinance requires a direct payment from landlords to tenants does not alter the deference that is due. *Kelo v. City of New London*, 545 U.S. 469, 483, 489 (2005); *Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 231-32, 239 (1984).

2.      Plaintiffs allege that the 2014 Mitigation Ordinance works an unconstitutional exaction: it imposes a condition on their right to evict tenants under the Ellis Act that is unrelated to the harms of eviction and that is not roughly proportional to the degree of those harms. *Nollan v. California Coastal Commission*, 483 U.S. 825, 836 (1987); *Dolan v. City of Tigard*, 512 U.S. 374, 391 (1994).

At bottom, that claim fails because landlords' required mitigation payment is roughly proportional to the harm they impose on their tenants by evicting them from a rent-regulated unit and forcing them to seek new housing at market rates.  But the Court need not even reach the merits, because Ninth Circuit has held that (1) a relocation payment to displaced tenants is not an exaction; (2) a *Nollan/Dolan* claim cannot be asserted as a facial challenge; and (3) the *Nollan/Dolan* test does not apply to legislatively imposed conditions.

3.    Plaintiffs also allege that the 2014 Mitigation Ordinance works a per se taking of their money or their right to regain possession of their rental units.  But a payment requirement, standing alone, is not a per se taking.  A per se analysis only applies to takings of money when the government takes some discrete and identifiable fund, like the interest from a bank account.  Nor is it a per se taking to compel landlords to continue to be subject to rent control, since rent control itself does not amount to a per se taking.

Plaintiffs' Takings Clause claims are really an effort to fit a square peg into a round hole.  An adjustment of an existing set of rent control and eviction regulations is most naturally analyzed as a regulatory taking, *i.e.* a claim that the regulation simply goes too far in diminishing the value of landlords' property.  While San Francisco disputes that the ordinance works a regulatory taking and would defend that claim vigorously, such a claim would at least not fail as a matter of law, as their per se and exactions claims fail.  But there is no regulatory takings claim at issue in this trial, because Plaintiffs have asserted that only on an as-applied basis.

4.    Plaintiffs' substantive due process claims fail because the 2014 Mitigation Ordinance is rationally related to the legitimate public purposes of mitigating the adverse impacts of eviction and protecting tenants from being displaced from San Francisco.  That is equally true for the applications of the ordinance that Plaintiffs claim are retroactive, *i.e.* cases where tenants were notified of their coming eviction before the effective date of the ordinance but were not evicted until after the effective date.  (In any event, such applications are not retroactive:  they operate on evictions that have not yet occurred as of the ordinance's effective date.)

5.    Finally, the 2014 Mitigation Ordinance is not facially preempted by the Ellis Act.  It imposes a wide range of prices on landlords' exercise of Ellis Act rights, from a few thousand dollars

to much more.  On a facial challenge, this Court cannot say that *all* applications of the ordinance will impose a "prohibitive price" on the exercise of Ellis rights, as it must to find facial preemption.  And to the extent that some applications of the ordinance arguably impose a prohibitive price, landlords can seek relief using the administrative remedies contained in the 2014 Mitigation Ordinance.

## STATEMENT OF FACTS

### I.   SAN FRANCISCO FACES A HOUSING AFFORDABILITY CRISIS

In the past several years, San Francisco has seen an extraordinary growth in housing prices, about 20% over the past four years.  Trial Ex. 13 at 2.  Increases in rental prices have been comparable.  For instance, two-bedroom rents have increased by 28.1% from 2005 to 2011, while one-bedroom rents and three-bedroom rents rose 18.6% and 12.8%, respectively, during the same period. *Id.* at 39.  And rental price increases have accelerated in the last couple of years, increasing by 25.2% between 2011 and 2013.  *Id.* at 41.  Citywide, the rental vacancy rate has decreased from 6.4% in 2009 to 2.8% in 2012.  *Id.* at 4.   The median rental rate citywide was $3,414 as of June 2013 for all types of apartments.  Trial Ex. 13 at 4.  That is simply unaffordable for many households in San Francisco.  Over 40% of households in San Francisco are already rent-burdened, meaning they pay 30% or more of their household income on housing costs.  *Id.*

At the same time as housing prices and rents have been increasing dramatically, Ellis Act evictions have increased.  San Francisco offers rent control protections to tenants in units built before 1979, which comprises most of the city's housing stock.  *See* S.F. Admin. Code § 37.2(r)(5), 37.3(a).  These rent control protections both control the rate of rent increases—landlords may only raise rents annually at 60% of inflation as measured by the consumer price index, *id.* §  37.3(a)(1)—and they prohibit landlords from evicting tenants except on certain specified grounds.  *Id.* § 37.9.

But under the Ellis Act, California Government Code §§ 7060 *et seq.*, local governments like San Francisco must allow landlords to evict all of the tenants in a particular building in order to exit the rental business.  The Ellis Act can be evoked at the landlord's discretion, and there are few defenses to an Ellis Act eviction.  *See, e.g.*, *Drouet v. Superior Court*, 31 Cal. 4th 583, 595-96 (2003) (landlord need only show a good faith intent to leave the rental business to prevail in Ellis Act unlawful detainer).  Once the landlord has successfully emptied a building of tenants using the Ellis

Act, the landlord faces restrictions on his right to re-rent units in the building.  *See* Stip. Facts ¶¶ 23-25.  For instance, he must rent units at rent-controlled rent levels for five years following exercise of his Ellis Act rights.  Stip. Facts ¶ 24.  But the landlord is free to make profitable use of the building in other ways following an Ellis eviction, such as by selling the units to individual buyers as tenancies-in-common or TICs, for eventual conversion to condominiums.[1]  Trial Ex. 13 at 10, 11-12.  In fact, one study showed that landlords who sold their buildings following Ellis evictions more than doubled their money, making a profit that far exceeded the rate at which median home prices rose in San Francisco.  Trial Ex. 14 at 1, 6.[2]

Perhaps driven by the massive run-up in both rents and sales prices in San Francisco, Ellis Act evictions are increasing faster than any other kind of eviction in San Francisco.  In fact, there was a 169% increase in Ellis Act evictions from 2010 to 2013.  Trial Ex. 13 at 1-2, 13.  And Ellis Act evictions are most common in some of the San Francisco neighborhoods with the biggest price increases, like North Beach, Haight-Ashbury, and the Inner Mission.  *Id.* at 3-4, 17.  Data also show that some of San Francisco's most vulnerable populations, such as seniors and people with disabilities, face the highest eviction rates among all types of evictions.  *Id.* at 26-27.

Tenants who are evicted pursuant to the Ellis Act face many challenges.  Not only is it extremely disruptive to lose a living situation—to commute patterns, to relationships, to children's school commutes—but tenants who are protected by rent control face an abrupt transition to San Francisco's current, hypercompetitive rental market.  Those households that are already rent-burdened and then are evicted pursuant to the Ellis Act may find the market in San Francisco simply impossible.  Indeed, one study showed that nearly a third of evicted tenants leave San Francisco.  Trial Ex. 15 at 2.  More than 13% of evicted tenants according to that study became homeless or used a post office box for their address following eviction.  *Id.* at 7.

---

[1] TICs are a form of fractional ownership where people share title to a multiunit building but assign by contract the right to occupy individual units in the building.

[2] This study did not attempt to account for any improvements owners made to their buildings before selling, so it is likely that actual profits were less, but still higher than the market average.

## II.     THE 2014 MITIGATION ORDINANCE WAS ADOPTED TO EASE THE HARMS OF EVICTION AND HELP DISPLACED TENANTS REMAIN IN SAN FRANCISCO

To address San Francisco's Ellis eviction crisis, the San Francisco Board of Supervisors passed ordinance no. 54-14 (the "2014 Mitigation Ordinance") on April 22, 2014.  Trial Ex. 10 at 15.  The purpose of the 2014 Mitigation Ordinance is stated in its legislative history: "In light of hardships faced by the increasing number of evicted tenants and the increased difficulty in finding affordable housing following eviction, this ordinance is designed to better mitigate the adverse impacts for people displaced by Ellis Act evictions."  *Id.* at 17; Stip. Facts ¶ 48.

The 2014 Mitigation Ordinance increases existing eviction-mitigation payments for tenants displaced by Ellis Act evictions.  In 2005, the Board had set the payment at $4,500 per tenant, up to $13,500 per unit, and that amount would increase with inflation.  S.F. Admin. Code § 37.9A(e)(3).  In addition, tenants who are 62 or older or disabled receive an additional payment of $3,000, also indexed to inflation.  *Id.*  The current, inflation adjusted amounts set by the 2005 ordinance are $5,256.10 per tenant; $15,795.27 maximum per unit; and $3,510.06 as an additional payment for tenants who are 62 or older or disabled.  Stip. Facts ¶ 33.

With the 2014 Mitigation Ordinance, the Board set these amounts as a floor for payments to Ellis-displaced tenants.  The new ordinance requires the San Francisco Controller to set a schedule to calculate the difference between the tenant's current, regulated rent and the fair market value of a unit in San Francisco that is comparable to the tenant's current unit.[3]  S.F. Admin. Code § 37.9A(e)(3)(E)(ii).  The landlord must pay 24 months' worth of that differential, or the amount required by the 2005 ordinance, whichever is greater, as well as the special payment for any tenants aged 62 or older or disabled.  *Id.* § 37.9A(e)(3)(E).  To ensure that the 2014 Mitigation Ordinance is fair to landlords, however, it has two safeguards.  First, the Rent Board may reduce the required mitigation payment where the Controller's formula does not accurately measure the difference between a tenant's current rent and the market rent for a comparable unit.  S.F. Admin. Code § 37.9A(e)(3)(H).  Second, the Rent Board can reduce the mitigation payment a landlord must make where that payment would cause an undue financial hardship to the landlord.  *Id.* § 37.9A(e)(3)(G);

---

[3] Plaintiffs in this case do not challenge the Controller's methodology, but that methodology is explained in a memo found in the legislative file.  *See* Trial Ex. 10 at 55-60.

Stip. Facts. ¶¶ 43-45.  The payment obligation applies to all evictions that occur after the effective date of the 2014 Mitigation Ordinance, June 1, 2014, even if the landlord gave notice of the eviction prior to the effective date.  S.F. Admin. Code § 37.9A(e)(3)(F).

In the course of debating the 2014 Mitigation Ordinance, the Board considered it twice before its Land Use and Economic Development Committee and three times before the full Board.  Trial Ex. 10 at 2-4.  The Board had before it reports from the Budget and Legislative Analyst concerning Ellis Act evictions, unlawful detainer lawsuits, and housing and rent increases throughout the City.  Trial Exs. 13, 14, 15.  And the Board heard testimony from members of the public, many of whom described their own experiences with Ellis evictions and the struggle to remain in San Francisco in the face of an eviction.  Trial Ex. 16 at 52, 56, 66, 71-73, 77.  Ultimately, the 2014 Mitigation Ordinance won the support of a supermajority of the Board and passed by a vote of 9-2.  Trial Ex. 10 at 15.

## III. THE 2014 MITIGATION ORDINANCE WILL RESULT IN A WIDE RANGE OF PAYMENTS TO TENANTS

Under the Controller's schedule, the amount of the mitigation payment a landlord owes to displaced tenants will vary depending on the date the tenancy commenced and the amount of rent the tenant currently pays.  *See* Trial Ex. 4 at 8-9.  Actual payments are likely to vary considerably, as illustrated by a look at the Ellis notices issued by landlords from February 1, 2014 through August 31, 2014.  Those notices impact 75 units, and the mitigation payment required by the Controller's schedule could be calculated for 57 of the units.  (In the other cases, the landlord did not provide the year the tenancy commenced, so the schedule could not be applied.)  The schedule payment for those 57 units varied from $3,313.54 payable to a unit with two tenants, who commenced their tenancy in 2011 and currently pay $866.15 per month, to $77,804.13 payable to a unit with two tenants who commenced their tenancy in 1987 and currently pay $3,241.84 per month.  *See* Lee Dec. Ex. B.  In the case of 11 of the 57 units, or 19% of them, the payment calculated by the Controller's schedule is less than the amount required to by paid by the 2005 ordinance, and so the landlord must pay the higher 2005 ordinance amount instead of the Controller's schedule amount.  Lee Dec. ¶ 6 & Ex. B.

Furthermore, the range of payments illustrated by the calculations for these 57 units shows that compelled payments under the 2014 Mitigation Ordinance are likely to be less than what landlords

voluntarily pay to tenants in private buyouts in some cases.  Collier Dec. ¶ 4 & Exs. A-C.  Landlords have sometimes voluntarily paid six-figure buyouts to tenants, even where the property remains subject to Ellis Act restrictions on re-rentals.  *Id.*

ARGUMENT

## I.    THE 2014 MITIGATION ORDINANCE SERVES A LEGITIMATE PUBLIC PURPOSE

Whenever the government takes private property, it must do so for a public purpose, regardless of whether it pays just compensation to the property owner.  *Thompson v. Consol. Gas Utils. Corp.*, 300 U.S. 55, 80 (1937).  The City disputes that the 2014 Mitigation Ordinance takes private property, as discussed in Sections II and III, below.  But assuming that there is a taking here, the ordinance satisfies the requirements of the Public Use Clause because it is rationally related to the legitimate public purpose of mitigating the adverse impacts of Ellis evictions and protecting vulnerable renters from price shocks in the housing market.  The judgment of the Board of Supervisors that this provision serves a legitimate public purpose is entitled to extreme deference, and courts are simply not permitted to second-guess legislative determinations about the best way to serve that legitimate purpose.

1.    The range of permissible public purposes that can be served under the Public Use Clause is extremely broad; indeed, "the public use requirement of the Takings Clause is coterminous with the regulatory power."  *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 422 (1992); *see also Chicago, B. & Q. Ry. Co. v. People of State of Illinois*, 200 U.S. 561, 593 (1906) (in discussing takings and the police power, stating "[t]he foundations upon which the power rests are in every case the same").  In short, if the government's objective is within its regulatory or police powers, then its purpose is a legitimate public purpose under the Public Use Clause.  Moreover, "when the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation."  *United States v. Gettysburg Elec. R. Co.*, 160 U.S. 668, 680 (1896).  "[W]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."  *Haw. Housing Auth. v. Midkiff*, 467 U.S. 229, 239 (1984) (quoting *Berman v. Parker*, 348 U.S. 26, 30, 32 (1954)).

There is ample authority to find San Francisco's purpose here—mitigating the adverse effects of evictions and preventing evicted tenants' displacement from San Francisco—a legitimate public purpose. A local government's "desire to control rising rents" is a valid one. *Action Apartment Ass'n v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1023 (9th Cir. 2007); *see also Pennell v. City of San Jose*, 485 U.S. 1, 13 (1988) ("[A] legitimate and rational goal of price or rate regulation is the protection of consumer welfare."). Providing mitigation payments to tenants displaced by the Ellis Act is also a proper exercise of local government police power. *Pieri v. City & Cnty. of San Francisco*, 137 Cal. App. 4th 886, 893 & n.4 (2006). And it is within the government's police power to attempt to stabilize the social fabric of existing neighborhoods by providing benefits to tenants to help them remain in their neighborhoods. *See Sadowsky v. City of New York*, 732 F.2d 312, 318 (2d Cir. 1984) (anti-displacement law to prevent conversion of single-room occupancy hotels to other purposes had "a valid, even admirable purpose"); *ABN 51st St. Partners v. City of New York*, 724 F. Supp. 1142, 1150 (S.D.N.Y. 1989) (preventing "community displacement" was "a legitimate public purpose within the State's police power").

The validity of aiding displaced tenants is further demonstrated by federal and California laws providing relocation benefits to tenants who are displaced from rental housing by the exercise of eminent domain. These benefits include not only moving costs but, where necessary, rental subsidies for up to 42 months—nearly twice the duration of assistance the 2014 Mitigation Ordinance provides—to ensure that a displaced tenant can obtain a "comparable replacement dwelling." 42 U.S.C. § 4624(a).[4] State law incorporates the same standards. Cal. Gov. Code § 7264(b). If providing rental subsidies for displaced people were outside the police power, then government would

---

[4] While this payment is ordinarily capped at $5,250, federal law permits the head of the displacing agency to exceed the $5,250 cap "on a case-by-case basis for good cause" if necessary to ensure that comparable replacement housing can be provided. 42 U.S.C. § 4626(a). Federal law forbids the agency from proceeding with displacements "unless the head of the displacing agency is satisfied that comparable replacement housing is available" to tenants who are losing their apartments. *Id.* § 4626(b). California law has the same standards. Cal. Gov. Code § 7264.5(a) (agency may exceed $5,250 for good cause in order to provide comparable replacement housing); *id.* § 7264.5(b) (no person may be required to move unless comparable replacement housing is available). In any event, the size of the required payment is not relevant to whether the government has the power to make the payment at all. And both federal law and California law allow payments to be made even where the displaced renter is not of limited means.

1   lack the power to implement these relocation programs, or perhaps even to provide Section 8 rental

2   subsidies and the like.  To San Francisco's knowledge, no court has ever held any such thing.

3         2.     Plaintiffs attempt to cast doubt on the City's legitimate public purpose by claiming that

4   the 2014 Mitigation Ordinance simply takes from landlords to give to tenants.  But a direct transfer

5   from one private party to another does not give rise to doubt under the Public Use Clause.  Far from it:

6   It is well established that a "condemnation result[ing] in the transfer of ownership from one private

7   party to another" is valid "as long as the condemning authorities were rational in their positions that

8   some public purpose was served."  *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S.

9   407, 422 (1992); *see also Kelo v. City of New London*, 545 U.S. 469, 483, 489 (2005) (taking of

10   nonblighted property to transfer to private party for purposes of economic development was public

11   use); *Midkiff*, 467 U.S. at 231-32 (condemnation of land to transfer title from owners to lessees "in

12   order to reduce the concentration of ownership of fees simple in the State" was public use); *Berman*,

13   348 U.S. at 30, 33-34 (condemnation of nonblighted department store for sale or lease to private entity

14   under redevelopment plan was public use); *Goldstein v. Pataki*, 516 F.3d 50, 54 (2d Cir. 2008)

15   (rejecting claim, on the pleadings, that true purpose of condemnations for Atlantic Yards development

16   in Brooklyn was to enrich private developer).

17         3.     In their allegations concerning their Public Use Claim, Plaintiffs apparently contend

18   that the 2014 Mitigation Ordinance does not benefit the public because tenants can use their mitigation

19   payments for any purpose, and are not required to use the money for relocation or to pay rent.

20   Complaint ¶ 87.  In short, Plaintiffs question whether the alleged taking actually advances the public

21   purpose the City claims for its ordinance.

22         It is doubtful that this question is even relevant to the Mitigation Ordinance's constitutionality

23   under the Public Use Clause.  After all, in 2005, the Supreme Court made clear that the question of

24   whether an ordinance "substantially advances legitimate state interests" is a due process inquiry, "not a

25   takings[] test, and . . . it has no proper place in our takings jurisprudence."  *Lingle v. Chevron U.S.A.*

26   *Inc.*, 544 U.S. 528, 540 (2005) (internal quotation marks and citation omitted).  It would make little

27   sense for the Supreme Court to excise a means-end inquiry from takings jurisprudence on the question

28

of whether a taking had occurred or not but nonetheless permit litigants to raise the means-end fit as a separate ground to invalidate a taking under the Public Use Clause.

But even if this means-end inquiry is a proper part of the Public Use test, San Francisco's ordinance satisfies it.  The Court is required to give great deference to the Board's determination that requiring landlords to make mitigation payments to the tenants they evict will mitigate the hardships of eviction and help those tenants remain in San Francisco.  *Action Apt. Ass'n*, 509 F.3d at 1023-24.  Indeed, as the Ninth Circuit has stated, "'whether the statute actually succeeds is *irrelevant*.'"  *Id.* at 1024 (quoting *Richardson v. City & County of Honolulu*, 124 F.3d 1150, 1159 (9th Cir. 1997)) (emphasis added by *Action Apartment Ass'n*); *see also Midkiff*, 467 U.S. at 240 ("deference to the legislature's public use determination is required until it is shown to involve an impossibility") (internal quotation marks omitted).  Thus, courts are not permitted to "second-guess [the City's] chosen means of implementing its indisputably legitimate goals."  *Action Apt. Ass'n*, 509 F.3d at 1024.

When faced with ample evidence that longtime renters often cannot afford new housing in San Francisco, and are instead forced to leave the city, become homeless, or accept substandard living arrangements, the Board of Supervisors rationally concluded that a mitigation payment to evicted tenants would help them afford new housing in the city.  And even if it is the case that *some* tenants do not use their mitigation payments for new housing, or that *some* tenants who are entitled to receive mitigation payments could afford to pay relocation costs or San Francisco rents on their own, that does not undermine the rationality of the Board's judgment.  Even for those tenants, eviction imposes "adverse impacts" that it is within the police power to ameliorate.  *Pieri,* 137 Cal. App. 4th at 893.  A person need not to be of limited income for eviction to have adverse impacts that the City is permitted to mitigate.  And a mitigation payment used to buy a car to accommodate a new commute to a faraway but affordable new unit, or to pay tuition costs to help an evicted tenant get a better job and remain in San Francisco in the long term, are also ways to mitigate the adverse impacts of eviction.[5]

---

[5] The Ellis Act does not limit the kinds of adverse impacts the City can target for mitigation. *See* Cal. Gov. Code § 7060.1(c)  (nothing in the Ellis Act "diminishes or enhances any power in any public entity to mitigate *any* adverse impact on persons displaced by reason of the withdrawal from rent or lease of any accommodations") (emphasis added).

CCSF's Trial Brief                                        10                          n:\govlit\li2014\150085\00957169.doc
Case No. 14-cv-03352-CRB (JSC)

At the end of the day, this Court is not empowered to second-guess the Board of Supervisors' determination that, on balance, the 2014 Mitigation Ordinance will serve its purposes even if it does not place conditions on tenants' use of mitigation payments.  As the Ninth Circuit has held in rejecting a Public Use challenge to a mobile home rent control ordinance:

> It may be true that in operation the ordinance does nothing more than take "money from the landlord and put [ ] it into the pocket of a tenant who no longer resides at the park." However, while one might believe that the ordinance is an ineffective—and indeed draconian—means by which to effect its goals, "[h]ow well the ordinance serves [its] purpose[s] is a legislative question, one the court will not consider."

*MHC Financing Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1129 (9th Cir. 2013) *cert. denied,* 134 S. Ct. 900 (U.S. 2014) (quoting *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 690 (9th Cir. 1993) (brackets in *Levald*)).  In short, "it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause."  *Midkiff*, 467 U.S. at 244.  Since the City's purpose here is a public one, that is enough for the Court to reject Plaintiffs' Public Use Clause challenge.

4.      In any event, where the Legislature is required only to have a rational basis for choosing the means that suit its ends, the fit between means and ends need not be perfect for the law to survive a facial challenge.  "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends."  *Heller v. Doe*, 509 U.S. 312, 321 (1993); *see also id.* (" 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.'") (quoting *Metropolis Theatre Co. v. Chicago,* 228 U.S. 61, 69-70 (1913).)  Thus, San Francisco was not required to adopt a burdensome means-testing requirement, or to investigate the uses that evicted tenants make of their mitigation payments, in order to determine that an easily administered, formula-based payment system advances its legitimate public purposes.  Plaintiffs' Public Use claim fails.

## II.      THE 2014 MITIGATION ORDINANCE IS NOT A FACIALLY UNCONSTITUTIONAL EXACTION

When the government requires a property owner to give up property or money in exchange for some benefit or permit, courts use a special test to determine whether an exactions taking has

occurred, known as the *Nollan/Dolan* test.[6]  If the government's decision whether to grant the permit is related to the property or money the government wants to take in exchange, and if the amount of property or money the government seeks is roughly proportional to whatever harm the government is trying to mitigate, then there is no taking and just compensation is not required.  Plaintiffs allege that the 2014 Mitigation Ordinance works an exaction under *Nollan*/*Dolan*, but their claims are wrong for the reasons discussed here.

### A.    *Garneau v. City of Seattle* **Forecloses Plaintiffs' Facial Claims**

The Ninth Circuit has already considered, and rejected, a claim that a relocation payment to displaced tenants requirement violates the Takings Clause.  *Garneau v. City of Seattle*, 147 F.3d 802 (9th Cir. 1998).  In *Garneau*, the Ninth Circuit considered a Seattle ordinance that required property owners to provide relocation assistance of $2,000 per tenant to low-income tenants whom the landlords displaced by demolishing or changing the use of their residential properties.  *Id.* at 804.  Landlords asserted facial and as-applied takings and substantive due process challenges.  *Id.* at 805.  The Ninth Circuit ultimately rejected all of the landlords' claims in a divided decision.  With respect to the facial takings claims, the landlords argued that paying relocation assistance was an unconstitutional exaction, just as Plaintiffs argue here.  *Id.* at 806.  The Ninth Circuit rejected these claims.

Writing for the court, Judge Brunetti held that the landlords' facial exactions claim was simply not cognizable under *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987).  Judge Brunetti first noted that under established Ninth Circuit jurisprudence, "[i]n facial takings claims, the inquiry is . . . limited to whether 'mere enactment' of the regulation" worked a taking.  *Garneau*, 147 F.3d at 807 (internal citations and quotation marks omitted).  That standard was not Judge Brunetti's invention; Ninth Circuit cases have previously held that to state a facial takings claim, a plaintiff must allege that *the enactment itself* took his or her property.  *See, e.g.*, *Carson Harbor Village, Ltd. v. City of Carson*, 37 F.3d 468, 473-74 (9th Cir. 1994).

---

[6] *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987).

Applying that standard to the Seattle relocation-payment ordinance, Judge Brunetti held squarely that "[t]he *Dolan* analysis cannot be applied in facial takings claims." *Id.* at 811. A facial challenge must allege that "the mere enactment of a statute constitutes a taking," while an exactions challenge under *Dolan* looks to "whether the government's exaction was too costly." *Id.* (internal quotation marks and citation omitted). Thus, "[b]ecause in a facial claim we do not analyse the exactions, *Dolan*'s test for when the exaction costs too much does not apply." *Id.*

Judge Spencer Williams (sitting by designation) concurred in the result—rejecting a facial exactions challenge to a relocation-payments requirement—but wrote separately to offer different reasoning. *Id.* at 817. In Judge Spencer's view, a taking does not occur until the government denies just compensation for the taking of private property, yet in *Garneau*, the plaintiffs did not seek just compensation but instead to invalidate the ordinance itself. *Id.* at 818. Thus, Judge Spencer believed that the landlords' claim did not sound in takings at all, but instead in due process. But he also agreed with Judge Brunetti that "the facts of the case at bar are not amenable to an analysis under . . . the 'individualized determination' required by *Dolan*." *Id.* at 820. (Judge O'Scannlain was the third member of the panel, and he dissented from the majority's disposition. *Id.* at 813.)

This Court is bound by *Garneau*'s holding that a facial challenge to a requirement to pay mitigation to displaced tenants does not state an exactions claim. *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) ("Once a panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court."). *Garneau*'s holding controls here because the Seattle ordinance cannot be distinguished from this case: both require landlords removing rental units from the market to pay money to tenants they are displacing. The only differences between the 1990 Seattle ordinance and the 2014 Mitigation Ordinance are the amounts of money at issue and the fact that Seattle's payment is available only to low-income tenants. But on a facial challenge, those differences are not relevant, because nothing in *Garneau*'s holding (or in the writings of either judge in the majority) turned on those features of Seattle's ordinance.

Furthermore, *Garneau* forecloses Plaintiffs' claim that the 2014 Mitigation Ordinance fails the *Nollan*/*Dolan* test on its face, because both Judge Brunetti and Judge Williams agreed that the *Dolan*

test of rough proportionality simply could not be applied to a facial takings claim concerning relocation payments.  147 F.3d at 811, 820.  Although these two judges did not sign on to the same opinion, lower courts are bound by any position that "represents a 'common denominator of the Court's reasoning,' enjoying the assent of" a majority of the judges of the panel.  *Lair v. Bullock*, 697 F.3d 1200, 1205 (9th Cir. 2012) (quoting *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1140 (9th Cir. 2005)).  Here, Judge Brunetti's and Judge Williams's agreement that the *Dolan* test of rough proportionality was inapplicable to a relocation payment ordinance creates controlling precedent that this Court is bound to follow.  *See McClung v. City of Sumner*, 548 F.3d 1219, 1228 n.4 (9th Cir. 2008) ("In the end, two of the three *Garneau* judges agreed that *Nollan/Dolan* did not apply to the permit requirement."), abrogated in part on other grounds by *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586 (2013).

Moreover, the same result follows from other Ninth Circuit cases.  As noted above, the circuit has held repeatedly that a facial takings claim must assert that the very enactment of a statute itself reduced the value of plaintiffs' property or otherwise worked a taking.  *Colony Cove Props., LLC v. City of Carson*, 640 F.3d 948, 956 (9th Cir. 2011); *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 965 (9th Cir. 2003); *Carson Harbor Village, Ltd. v. City of Carson*, 37 F.3d 468, 473-74 (9th Cir. 1994); *Levald*, 998 F.2d at 686.  Plaintiffs do not allege anywhere in their Complaint that the mere enactment of the 2014 Mitigation Ordinance took their property.  Thus, they do not properly state a facial takings challenge to the ordinance, and their exactions claim can only be addressed as applied.

### B.      A Legislatively Imposed Condition Is Not Analyzed Under *Nollan*/*Dolan*

*Nollan*, *Dolan*, and *Koontz* all concerned ad hoc permit conditions imposed by government officials upon particular development schemes.  *Koontz*, 133 S. Ct. at 2593; *Dolan*, 512 U.S. at 379-80; *Nollan*, 483 U.S. at 828-29.  This case, by contrast, involves a legislative condition imposed on each and every landlord who evicts tenants pursuant to the Ellis Act.  The only discretion that exists in any city official is the power to *reduce*, not *impose or increase* the required payment.

That distinction is fatal to Plaintiffs' exaction claim.  The Ninth Circuit has held that a "legislative, generally applicable development condition that does not require the owner to relinquish

rights in the real property, as opposed to an adjudicative land-use exaction," should be analyzed as a regulatory taking under the ad hoc *Penn Central* factors, not under *Nollan* and *Dolan*.  *See McClung*, 548 F.3d at 1222.  The reason for this distinction between ad hoc development exactions and across-the-board legislation is that the latter requirements "have less chance of abuse due to their general application."  *Id.* at 1228.  Other jurisdictions have adopted a similar distinction between legislatively imposed conditions and case-by-case development conditions.  *See San Remo Hotel L.P. v. City & County of San Francisco*, 27 Cal.4th 643, 668-69 (2002); *St. Clair Cnty. Home Builders Ass'n v. City of Pell City*, 61 So. 3d 992, 1007 (Ala. 2010); *Krupp v. Breckenridge Sanitation Dist.*, 19 P.3d 687, 695-96 (Colo. 2001); *Greater Atlanta Homebuilders Ass'n v. DeKalb Cnty.*, 588 S.E.2d 694, 697 (Ga. 2003); *Rogers Mach., Inc. v. Washington Cnty.*, 45 P.3d 966, 981-82 (Or. Ct. App. 2002).  And the Supreme Court itself has suggested that the heightened scrutiny of its rough proportionality requirement does not apply to legislatively imposed conditions.  *Dolan*, 512 U.S. at 385 (noting difference between ad hoc permit conditions and  "essentially legislative determinations").

  *McClung* also holds that monetary fees imposed as a condition of development, rather than interests in real property, cannot be exactions.  548 F.3d at 1228.  That part of *McClung*'s holding was overruled by the Supreme Court in *Koontz*, 133 S. Ct. at 2594.  But *McClung*'s holding about the inapplicability of *Nollan* and *Dolan* to legislative enactments was independent of its holding about fees.  *McClung*, 548 F.3d at 1228 ("*Even if* [the legislatively imposed requirement] could be viewed as a monetary exaction . . ., *Nollan/Dolan* still would not apply") (emphasis added).  The former holding has not been questioned or overruled, and remains the law in this Circuit.[7]  Thus, Plaintiffs' facial takings claim brought under *Nollan* and *Dolan* must fail because it is a challenge to conditions imposed by legislation, not by ad hoc decisions by city planners.  The only viable takings claim that can be leveled against the 2014 Mitigation Ordinance is a *Penn Central* regulatory takings claim, which is not at issue in the coming trial because Plaintiffs have alleged it only on an as-applied basis.

_____

[7] In *Horne v. U.S. Department of Agriculture*, the Ninth Circuit applied the *Nollan/Dolan* test to a marketing order issued by the Secretary of Agriculture as a federal regulation.  750 F.3d 1128, 1133-34 (9th Cir. 2014).  While a regulation resembles legislation in that it applies broadly, *Horne* does not mention or discuss *McClung*'s holding that legislative conditions are analyzed under *Penn Central* rather than under *Nollan/Dolan*.  Thus, *Horne* does not and cannot overrule *McClung*, since only the Ninth Circuit sitting en banc or the Supreme Court can overrule published panel opinions.

**C.      Mitigation Payments to Evicted Tenants Will Be Roughly Proportional To The Adverse Impacts Of Eviction**

Even if Plaintiffs' *Nollan/Dolan* claim were viable on a facial challenge, or were properly alleged against a generally applicable legislative condition, it would nonetheless fail on the merits. Where the government imposes a condition on the development of property that it cannot directly compel, that condition is only constitutional if it "serves the same legitimate police-power purpose as a refusal" to allow the development. *Nollan*, 483 U.S. at 836. There must be a "nexus" between the permit condition and the state interest asserted by the government in its decision whether to issue the permit. *Id.* at 837. The relationship between the government's concern and the permit condition need not be exactly calibrated, but there must be a "rough proportionality" between the government's interest and the exaction. *Dolan*, 512 U.S. at 391. "No precise mathematical calculation is required," but the government bears the burden of showing that rough proportionality exists, and it "must make some kind of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *Id.* A formula that is tailored to the particular conditions to be mitigated satisfies the "individualized determination" requirement. *Horne v. U.S. Dep't of Agriculture*, 750 F.3d 1128, 1144 (9th Cir. 2014).

The 2014 Mitigation Ordinance satisfies these requirements of nexus and rough proportionality. A tenant whose unit is subject to rent control under San Francisco's rent ordinances pays a below-market rent and cannot be evicted except under narrow, specified circumstances. She can typically count on occupying her unit for the foreseeable future. When she is evicted pursuant to the Ellis Act, she is forced into the unregulated market and must typically secure a new unit at market rent. The mitigation ordinance compensates her for that adverse impact of eviction by requiring the landlord to pay her a sufficient amount to secure a comparable market-rate apartment for two years, as measured by the Controller's formula. There is a very close nexus between the adverse financial impact the tenant suffers and the landlord's payment, and there is more than a rough proportionality between that impact and the amount of the payment. *See Horne*, 750 F.3d at 1144 (finding marketing order's requirement that growers refrain from selling an amount of raisins each year that varied "annually in accordance with market conditions" to be "at least roughly proportional to [the marketing

order's] goals").  And in cases where the Controller's formula fails to "reasonably reflect the market rate for a comparable unit in San Francisco" and therefore does not result in a tenant payment that is roughly proportional to the harms of eviction, the Rent Board is empowered to reduce the landlord's payment accordingly.  S.F. Admin. Code § 37.9A(e)(3)(H).  Plaintiffs' facial challenge fails on the merits.

### D.   San Francisco Can Directly Compel Tenant Payments, So The *Nollan/Dolan* Test Does Not Apply

In order for the *Nollan/Dolan* test to apply, the government must first demand, as a condition of receiving some government permit or benefit, some kind of exaction that it could not directly compel.  *Dolan*, 512 U.S. at 384; *Nollan*, 483 U.S. at 831.  But San Francisco has not done that here.  Instead, it has compelled landlords to pay, in a lump sum, the equivalent of two years of the benefits of rent control to the tenant.  Since rent control is not on its face a per se or regulatory taking, *see Yee v. City of Escondido*, 503 U.S. 519, 528 (1992); *MHC Financing*, 714 F.3d at 1126-29; *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1121-22 (9th Cir. 2010) (en banc), compelling landlords to pay the same benefit to the tenant in cash, in exchange for receiving possession of the unit, cannot be a taking because it puts the landlord in an economic position that is equivalent to his position under rent control.  (Indeed, on Plaintiffs' as-applied challenge, San Francisco expects to show that the landlord is in a much better economic position after evicting tenants under the Ellis Act, because of the immense premium the San Francisco real estate market pays for vacant units.)  Thus, because the 2014 Mitigation Ordinance merely works an economic adjustment to the landlord-tenant relationship, it enjoys the same constitutionality as rent control.

### III.   PLAINTIFFS' PER SE TAKING CLAIMS FAIL

As an alternative to their exactions claim, Plaintiffs contend that the 2014 Mitigation Ordinance works a per se taking either of (1) their money or (2) their right to retake possession of their rental units.  The per se taking approach is used when the government permanently physically occupies property, or when it regulates property so pervasively that its regulation is tantamount to a permanent physical occupation of property.  The requirement of paying just compensation in such situations is automatic.  Not surprisingly, these are "relatively narrow" categories that are not often

applied. *See Lingle*, 544 U.S. at 537-38. This is not one of the rare cases where the per se takings approach applies.

> **A.    Taking Money Is Not A Per Se Taking**

1.    Plaintiffs' per se takings argument fails because the 2014 Mitigation Ordinance does not order them outright to pay money to their tenants. Instead, the 2014 Mitigation Ordinance conditions the exercise of Ellis Act eviction rights on an evicting landlord's payment of money to displaced tenants. S.F. Admin. Code § 37.9(a)(13). To avoid the requirement of paying money, a landlord need only refrain from evicting his tenants. Simply because a choice is involved does not mean, of course, that the 2014 Mitigation Ordinance is automatically constitutional. The government can still violate the constitution by placing unconstitutional conditions on property owners' choices. But alleged conditional takings are best evaluated under the exactions-takings framework of *Nollan/Dolan*, or under the regulatory-takings framework of *Penn Central*, but not as per se takings.

Plaintiffs nonetheless ask this Court to take the 2014 Mitigation Ordinance out of context and treat it as if it ordered them outright to pay money to their tenants, without regard to the benefit they receive, *i.e.* regaining possession of their rental units. That context-stripping approach does not make sense, and the Ninth Circuit has confirmed as much in another context. *See Horne v. U.S. Dep't of Agriculture*, 750 F.3d 1128, 1137 (9th Cir. 2014) (on takings challenge, imposition of monetary penalty for failure to follow raisin marketing order's reserve requirement "cannot be analyzed without reference to the reserve requirement"). Similarly, in this case, where the mitigation requirement is a part of a larger regulatory system, the mitigation payment requirement cannot be analyzed without reference to rent control and the Ellis Act.

2.    In addition, a payment requirement, standing alone, is not a per se taking under the Supreme Court's cases. In *Eastern Enterprises v. Apfel*, the Court considered a statute that imposed retroactive liability on a coal mining company to provide health benefits to its long-retired workers. 524 U.S. 498 (1998). The statute was enacted decades after previous legislation had created a health benefits fund and purported to finally determine the company's health-benefit liabilities. *Id.* at 514. The Supreme Court struck down the company's payment obligation, but no single rationale for that

result prevailed.[8]  The one holding in *Eastern Enterprises* that was unanimous, however, was the holding that the company's retroactive payment obligation was not a per se taking.  *Id.* at 522-23 (plurality); 544 (Kennedy, J., concurring in result); 554 (Breyer, J., dissenting).

*Eastern Enterprises* remains good law on that point.  While the Supreme Court has applied a per se approach to government's appropriation of a *specific, identifiable fund*, such as the interest on a bank account, *Brown v. Legal Fdn. of Wash.*, 538 U.S. 216, 235 (2003), or interest earned on interpleader funds, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162 (1980), it has never applied the per se takings approach to fungible payments of money.  *See United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9 (1989).  The Court recently reaffirmed this rule in *Koontz*, when it distinguished a monetary exaction on the development of real property from the retroactive payment requirement in *Eastern Enterprises*:  "In this case, unlike *Eastern Enterprises*, the monetary obligation burdened petitioner's ownership of a specific parcel of land. . . .  The fulcrum this case turns on is the direct link between the government's demand and a specific parcel of real property."  *Koontz*, 133 S. Ct. at 2599-2600.[9]  Even more recently, *Horne* refused to apply a per se takings approach to an alleged taking of raisins by a marketing order that required growers to hold a certain number of raisins off the market every year or pay a monetary penalty.  750 F.3d at 1137.  Thus, under the teaching of *Eastern Enterprises*, *Koontz*, and *Horne*, the 2014 Mitigation Ordinance's requirement of a money payment is not a per se taking.

### B. The Mitigation Ordinance Does Not Take Owners' Rights To Possess Their Rental Units

As an alternative to their claim that the 2014 Mitigation Ordinance works a per se taking of landlords' money, Plaintiffs state that they will press the claim that the ordinance works a per se taking by taking "their real property interests, particularly their right to assume exclusive possession of their property."  *See* [Proposed] Joint Pretrial Order for Trial on Facial Claims at 2.

---

[8] Four justices believed the legislation was a regulatory taking as applied to the company.  *Eastern Ents.*, 524 U.S. at 523-29.  Justice Kennedy believed it was not a taking but that it violated the company's due process rights.  *Id.* at 543-46.

[9] In *Koontz*, the Court did not apply a per se takings approach to the government's taking of money in connection with real property.  Instead, because the payment was a condition of development of the property, it held that the *Nollan/Dolan* exactions test applied.  133 S. Ct. at 2595-96.  Thus, *Koontz* does not support an argument that a per se takings approach applies here.

1.     Recasting their per se takings claim in this fashion does not revive it.  All that Plaintiffs allege with this claim is that if they choose not make a mitigation payment, they will continue to be subject to rent control.  This claim is time-barred.  Rent control has been in effect in San Francisco for many years, and the requirement to make a tenant payment as a condition of using the Ellis Act to terminate a rent-controlled tenancy has been in effect since 1986.  Stip. Facts ¶ 27.  On a facial challenge, the amount of the payment is irrelevant; the gravamen of Plaintiffs' facial takings claim here is that their right to possess their units has been taken by a requirement that they pay money—and that requirement has been in effect for decades.  *See Colony Cove Props.*, 640 F.3d at 957 (adding new methodology for determining rent increases to existing substantive rent control law did not create new statute of limitations; facial challenge accrued at the time the substantive rent control law was passed).

2.     Even if this claim were timely, it would lack merit. It is well established that, because the property owner either initially consented to the creation of a tenancy (or acquired property where a tenancy was in place), rent control does not work a permanent physical occupation of property but is instead analyzed as a regulatory taking.  *Yee*, 503 U.S. at 528; *see also F.C.C. v. Florida Power Corp.*, 480 U.S. 245, 252 (1987) ("Appellees contend, in essence, that it is a taking [per se] for a tenant invited to lease at a rent of $7.15 to remain at the regulated rent of $1.79. But it is the invitation, not the rent, that makes the difference"); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982).

Plaintiffs may contend that if they cannot use the Ellis Act to regain possession of their units, then the occupation of property that they suffer by having rent-controlled tenants is permanent.  This, they may contend, will take their case outside the *Yee* rule, since *Yee* noted that "[a] different case would be presented were the statute, on its face or as applied, to compel a landlord over objection to rent his property or to refrain in perpetuity from terminating a tenancy."  503 U.S. at 528.[10]  But the 2014 Mitigation Ordinance does not *compel* Plaintiffs to continue renting their properties to tenants.  They can choose between making a required payment and continuing to rent their properties.  This is

---

[10] This statement from *Yee* was dicta.  To the City's knowledge, it has never been used to invalidate a rent control ordinance by an appellate court.  Indeed, the Second Circuit has found that a rent-controlled tenancy of indefinite duration does not become a per se taking.  *Harmon v. Markus*, 412 F. App'x 420, 422 (2d Cir. 2011).

1    not a compelled permanent physical invasion.  And indeed, the only thing the 2014 Mitigation

2    Ordinance changed was the amount of the payment, and then only in those cases where the

3    Controller's schedule provided for a bigger payment to the tenant than the 2005 Ordinance.  *See* Lee

4    Dec. ¶ 6 (of 57 units subject to Ellis notices for which mitigation payments could be calculated,

5    tenants in 11 units would receive 2005 Ordinance payment amount because it was greater than

6    calculated under the Controller's schedule).  Thus, the City has not taken their right to regain

7    possession of their units; it has merely raised the price.  That is not a per se taking.

8    **IV.    PLAINTIFFS' SUBSTANTIVE DUE PROCESS CLAIMS FAIL**

9        1.    Economic legislation violates substantive due process norms only if it is "arbitrary and

10   irrational."  *Richardson v. City & County of Honolulu*, 124 F.3d 1150, 1162 (9th Cir. 1994).

11   "Governmental action is rationally related to a legitimate goal unless the action is clearly arbitrary and

12   unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."

13   *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1193 (9th Cir. 2013) (internal quotation

14   marks and citation omitted).  "[T]here is no requirement that the statute *actually* advance its stated

15   purposes; rather, the inquiry focuses on whether the governmental body *could* have had no legitimate

16   reason for its decision."  *Levald*, 998 F.2d at 690 (internal quotation marks and citation omitted).  This

17   extremely deferential standard is very similar to the one the Court applies to Plaintiffs' Public Use

18   Clause claim.  For the reasons discussed with respect to that claim, because "it is at least fairly

19   debatable" that the 2014 Mitigation Ordinance "was rationally related to legitimate governmental

20   interests, the City's actions must be upheld."  *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234

21   (9th Cir. 1994) (internal quotation marks and citation omitted).  Thus, Plaintiffs' substantive due

22   process claim fails.

23       2.    To undercut that result, Plaintiffs argue that the 2014 Mitigation Ordinance is

24   retroactive, at least as applied to landlords who issued Ellis notices to tenants before the June 1, 2014

25   effective date of the ordinance.  But that is not a retroactive effect.  A landlord who wants to avoid

26   paying tenants the money required by the ordinance can simply refrain from evicting them.  The

27   ordinance does not operate on *evictions that have already happened*; it operates only on evictions that

28   occur after the ordinance's effective date.  *See Landgraf v. USI Film Products*, 511 U.S. 244, 269-70

(1994) (to determine whether a statute operates retroactively, "the court must ask whether the new provision attaches new legal consequences to *events completed before its enactment*") (emphasis added).  Because the 2014 Mitigation Ordinance does not attach new consequences to evictions completed before its effective date—and indeed, landlords could avoid its consequences merely by choosing not to evict their tenants—it is not retroactive.

3.      But in any event, even if the 2014 Mitigation Ordinance were treated as retroactive legislation, it would readily pass due process scrutiny.  As the Supreme Court has repeatedly stated, " 'our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations.  This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.' "  *Concrete Pipe & Products of California, Inc. v. Constr. Laborers Pension Trust for S. California*, 508 U.S. 602, 637 (1993) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976)) (internal citations omitted).  Thus, the rational basis test applies to due process challenges to retroactive legislation just as it applies to prospective legislation; the only difference is that the retroactive effect must itself have a rational basis.  *See Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729-30 (1984) ("The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process . . . .  But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.").

The 2014 Mitigation Ordinance has a rational basis.  It was rational for the Board of Supervisors to believe that tenants evicted pursuant to the Ellis Act will suffer adverse effects from evictions and that mitigation payments would ameliorate those adverse effects.  That rational basis holds true for evictions that are noticed after June 2014 and occur after June 2014, and it holds equally true for evictions that were noticed before June 2014 but occurred after June 2014.  Thus, the 2014 Mitigation Ordinance does not violate landlords' due process rights.

## V.      PLAINTIFFS' ELLIS PREEMPTION CLAIMS FAIL

1.      Plaintiffs' facial claim of Ellis Act preemption is foreclosed by a published decision of the California Court of Appeal holding that the 2005 Ordinance's payment requirement was not preempted by the Ellis Act.  *Pieri v. City & County of San Francisco*, 137 Cal. App. 4th 886, 889

1    (2006).  The 2014 Mitigation Ordinance permits landlords to pay the amount required by the 2005

2    Ordinance in at least some circumstances—indeed, for nearly 20% of the rental units subject to Ellis

3    notices filed with the Rent Board since February 2014, the amount of mitigation payment required by

4    the Controller's schedule is lower than that required by the 2005 Ordinance.  Lee Dec. ¶ 6.  Thus, at

5    least some applications of the 2014 Mitigation Ordinance are not preempted by the Ellis Act under the

6    controlling authority of *Pieri*.

7           That is fatal to Plaintiffs' facial preemption claim.  "A facial challenge is the most difficult

8    challenge to mount successfully, since the challenger must establish that *no set of circumstances exists*

9    *under which the [law] would be valid.*  The moving party must show that the challenged statutes or

10   regulations inevitably pose a present total and fatal conflict with applicable prohibitions."  *Assn. of*

11   *Cal. Ins. Companies v. Poizner*, 180 Cal. App. 4th 1029, 1054 (2009) (emphasis and brackets in

12   original, internal citation and quotation marks omitted).  Because there are circumstances under which

13   the 2014 Mitigation Ordinance can be applied without offending the Ellis Act, Plaintiffs' facial

14   challenge fails.

15          2.      Independently, the Mitigation Ordinance is not preempted because it does not

16   effectively compel landlords to remain in the rental business.  That is the test for Ellis Act preemption.

17          The Ellis Act forbids local governments from "compel[ling] the owner of any residential real

18   property to offer, or to continue to offer, accommodations in the property for rent or lease."  Cal.

19   Gov't Code § 7060(a).  Nothing in the 2014 Mitigation Ordinance requires property owners to

20   continue to offer their properties for lease, and so it does not conflict directly with this provision.

21          Nor does the 2014 Mitigation Ordinance impliedly conflict with the Ellis Act.  That act

22   expressly permits local governments to mitigate harms to evicted tenants.  It states that nothing in the

23   Ellis Act "[d]iminishes or enhances any power in any public entity to mitigate any adverse impact on

24   persons displaced by reason of the withdrawal from rent or lease of any accommodations."  Cal. Gov't

25   Code § 7060.1(c).  To reconcile these two provisions of the Ellis Act—forbidding cities from

26   compelling landlords to remain in the business but allowing cities to mitigate adverse impacts of

27   eviction—the California appellate courts have repeatedly stated that local ordinances conflict with the

28   Ellis Act only when they have imposed a "prohibitive price" on the exercise of Ellis Act rights.  *Pieri*,

137 Cal. App. 4th at 893; *see also id*. at 893 n.4 (same); *id*. at 894 (same); *Reidy v. City & County of San Francisco*, 123 Cal. App. 4th 580, 590 (2004) (the Ellis Act preempts regulations that "effectively compel residential rental use and prevent the property owner from quitting the rental business"); *Channing Properties v. City of Berkeley*, 11 Cal. App. 4th 88, 100 (1992) (overruled on other grounds by statute as stated in *Pieri*, 137 Cal. App. 4th at 891) ("depending on the landlord's financial situation," requiring landlord to pay $148,500 in relocation assistance to remove 33 units "might well 'impose[ ] a prohibitive price on the exercise of the right under the Act' ") (quoting *Javidzad v. City of Santa Monica*, 204 Cal. App. 3d 524, 531 (1988)); *Bullock v. City & County of San Francisco*, 221 Cal. App. 3d 1072, 1101 (1990) (Ellis Act preempts measure that "is a prohibitive price on the exercise of" landlord's right to evict all tenants) (internal quotation marks omitted); *id*. ("To allow the City to so enlarge the concept of mitigation that it prevents plaintiff from exercising his right to go out of business would make the Ellis Act a dead letter . . . .").

On its face, the 2014 Mitigation Ordinance imposes a wide range of payment obligations on landlords, depending on the tenant's current rent and the duration of the tenancy. *See* Stip. Facts ¶ 40(a)-(j); Lee Dec. Ex. B. The Court cannot say as a matter of law that all of these varying payment amounts will effectively compel landlords to remain in the rental business. And even where the payment amounts are so onerous as to indirectly compel landlords to continue renting their units, such a payment would surely constitute an "undue financial hardship" that would permit the Rent Board to reduce the landlord's payments or otherwise grant relief. *See* S.F. Admin. Code § 37.9A(e)(3)(G).[11] Thus, it is impossible to say on a facial challenge that the 2014 Mitigation Ordinance imposes a prohibitive price on the exercise of Ellis Act rights in all its applications.

---

[11] At the hearing on Plaintiffs' motion for a temporary restraining order, this Court raised the question whether the undue hardship provisions were sufficiently definite so that landlords could get meaningful relief. Any claim that the 2014 Mitigation Ordinance is unduly vague or standardless is not one that Plaintiffs have raised, so the Court should not base its decision on this concern. Furthermore, the Board heard testimony that the Rent Board is in fact experienced in adjudicating landlord hardship claims. *See* Trial Ex. 10 at 21-23. The Board was entitled to credit that testimony. And in any event, state-law remedies exist to correct any abuses of the Rent Board's discretion in adjudicating landlord hardship claims. *See* Cal. Code Civ. Proc. 1094.5.

## VI.   PLAINTIFFS' PER SE AND EXACTIONS TAKINGS CLAIMS ARE UNRIPE

Because a takings claim challenges the government's failure to pay just compensation for taking property, a plaintiff must first seek compensation through any state remedies that are available in order to ripen a federal takings claim. *See Williamson County Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 190 (1985). California has available procedures for seeking takings compensation. *See Kavanau v. City of Santa Monica*, 16 Cal. 4th 761 (1997). But Plaintiffs here have not attempted to seek compensation from the California courts. Stip. Facts ¶ 79. Thus, they have not ripened their claims. Ripeness is now a prudential concern of the federal courts rather than a jurisdictional bar. *Guggenheim*, 638 F.3d at 1117-18. But a plaintiff asserting a takings claim in federal court must still show "that it would be appropriate for this Court to adjudicate the claim at this point in time." *Surf & Sand, LLC v. City of Capitola*, 717 F. Supp. 2d 934, 938 (N.D. Cal. 2010). Plaintiffs offer "no good reason why the district court should" decide to excuse their failure to ripen their claim. *Surf & Sand, LLC v. City of Capitola*, 377 F. App'x 662, 664 (9th Cir. 2010). The ripeness requirement applies to facial challenges as well as to as-applied challenges. *Equity Lifestyle Props. v. County of San Luis Obispo*, 548 F.3d 1184, 1190 n.13 (9th Cir. 2007). Because Plaintiffs offer no reason why they should be excused from the ripeness requirement, this Court should exercise its discretion dismiss their unripe exactions and per se takings claims without prejudice.

## VII.   INJUNCTIVE RELIEF IS NOT AVAILABLE TO REMEDY A TAKING WITHOUT JUST COMPENSATION

"Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984). If the 2014 Mitigation Ordinance works a per se taking of Plaintiffs' property, or if it works an unconstitutional exaction, then this Court may award damages according to proof. But equitable relief is not available on these claims. *See also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127-28 (1985); *Wash. Legal Fdn. v. Legal Fdn. of Wash.*, 271 F.3d 835, 849 (9th Cir. 2001). Plaintiffs make no argument that they could not obtain compensation from San Francisco, or that San Francisco's reimbursement would make them whole.

Dated:  September 15, 2014

DENNIS J. HERRERA
City Attorney
WAYNE SNODGRASS
CHRISTINE VAN AKEN
Deputy City Attorneys


By:   /s/*Christine Van Aken*
CHRISTINE VAN AKEN

Attorneys for Defendant CITY AND COUNTY OF SAN
FRANCISCO