IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DANIEL LEVIN, ET AL.,                           No. 3:14-cv-03352-CRB

        Plaintiffs,                          **MEMORANDUM OF FINDINGS OF**
                                                **FACT AND CONCLUSIONS OF LAW**
  v.

CITY AND COUNTY OF SAN FRANCISCO,

        Defendant.
_____/

     In July 2014, the City and County of San Francisco enacted an Ordinance that requires property owners wishing to withdraw their rent-controlled property from the rental market to pay a lump sum to displaced tenants.  The 2014 Ordinance requires that property owners pay the greater of a relocation payment due under a 2005 Ordinance or the new, "enhanced" amount: twenty-four times the difference between the units' current monthly rate and an amount that purports to be the fair market value of a comparable unit in San Francisco, as calculated by a schedule developed by the Controller's Office.  Plaintiffs, who are property owners now obligated to pay amounts that range to hundreds of thousands of dollars per unit, allege that the Ordinance on its face is an unconstitutional taking in violation of the Fifth Amendment.

     On October 6, 2014, the Court held a bench trial on the merits in which the parties stipulated to all relevant facts.  Pursuant to Federal Rule of Civil Procedure 52, this Court

United States District Court
For the Northern District of California

1  now makes findings of fact and conclusions of law.  The Court holds that the Ordinance

2  effects an unconstitutional taking by conditioning property owners' right to withdraw their

3  property on a monetary exaction not sufficiently related to the impact of the withdrawal.  See

4  Nollan v. California Coastal Comm'n, 483 U.S. 825, 837 (1987); Dolan v. City of Tigard,

5  512 U.S. 374, 395 (1994); Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586,

6  2599 (2013).  Accordingly, the Court GRANTS declaratory and injunctive relief to Plaintiffs.

7  The Court also STAYS this decision until October 24, 2014, the date payment must be made

8  under the Ordinance to Plaintiff Park Lane's tenants, to allow the City to seek further relief in

9  the Ninth Circuit.

10         In so doing, the Court does not pass judgment on the wisdom of the Ordinance, nor

11  doubt either the severity of the housing crisis or the sincerity of the City legislature's

12  attempts to ameliorate that crisis' effects on some San Franciscans.  Nor does the Court

13  consider whether different drafting decisions on the part of the City's commissioners would

14  have been wiser, or more effective, or more finely tuned to the City's stated ends.  A

15  monetary exactions taking "does not implicate normative considerations about the wisdom of

16  government decisions," nor posit whether the exaction is "arbitrary or unfair."  Koontz, 133

17  S. Ct. at 2600.  This Court's task is to determine whether the exaction demanded by the City

18  in exchange for an Ellis Act withdrawal bears the "required degree of connection between

19  the exactions imposed by the city and the projected impacts" of the property owner's

20  proposed change in land use.  See Dolan, 512 U.S. at 377.  This is because, "[w]hatever the

21  wisdom of such a policy, it would transfer an interest in property from the landowner to the

22  government" and thus "amount[s] to a per se taking similar to the taking of an easement or a

23  lien."  Koontz, 133 S. Ct. at 2600.  This Court's role, then, is to determine whether the

24  taking, without just compensation, passes constitutional muster by "satisf[ying] the nexus

25  and rough proportionality requirements of Nollan and Dolan."  See id. at 2599.  It does not.

26

27

28

**United States District Court**
For the Northern District of California

# I.     FACTUAL BACKGROUND

## A.     The San Francisco Housing Crisis

San Francisco faces an affordable housing crisis of remarkable proportions.  There are "deep structural problems in the housing market," in which increasing demand has met a supply limited by a City that has "not produc[ed] housing as [its] population has grown."  Tr. Ex. 16 (dkt. 60-22) at 12.  "Increased employment and population" has clashed with "minimal increases in new housing" to put "upward pressure on rental rates" and downward pressure on the citywide rental vacancy rate, which hovered at just 2.8% in 2012.  Tr. Ex. 13 (dkt. 60-19) at 4.

The City's housing stock consists of approximately 372,830 dwelling units, of which 64% are occupied by renters.  Tr. Ex. 13 at 6-7.  Against this backdrop, property owners annually withdraw only a very small number of units from the rental market each year.  The number of petitions for withdrawal that the City received fluctuated each year leading up to the passage of the Ordinance challenged here, but affected a tiny percentage of the City's housing stock overall.  See Tr. Ex. 13, at 2, 14.  The Rent Board processed 43 Ellis Act evictions in its fiscal year 2010, for example, and 116 in 2013.  Tr. Ex. 13 at 2, 14.

## B.     San Francisco Housing Measures

The City government has instituted a number of measures to combat unaffordable rental rates in San Francisco.  The most significant of these is a comprehensive rent control plan that covers nearly all rental property in buildings constructed before June 1979, thereby affecting most rental property in San Francisco.  See Tr. Ex. 13 at 8; Stip. Facts (dkt. 50-1) ¶ 19.  Rent increases are strictly limited to a rate lower than inflation under the guidelines published by the San Francisco Rent Control Board–specifically, to sixty percent of the Bay Area Cost of Living Index, resulting in an ever-diminishing return on investment on the property.  See Tr. Ex. 13 at 8; Stip. Facts ¶ 19; see generally S.F., Cal., Admin. Code §§ 37.2(r)(5), 37.3(a), and 37.9.  Under this rubric, rent increases generally hover around one or two percent per year.  See Tr. Ex. 13 at 8.  Once a tenant voluntarily departs a unit, landlords are unrestricted in the new initial rent they may set for a new tenant, but the unit

**United States District Court**
For the Northern District of California

1   remains rent-controlled and thereby subject to limits on year-to-year increases.  Tr. Ex. 13 at

2   8.  Tenants in rent-controlled units also enjoy protection from eviction, which must be for

3   one of sixteen enumerated "just causes;" otherwise, tenants are entitled to certain procedures

4   for a no-fault eviction.  Tr. Ex. 13 at 8.

5          Pursuant to a variety of San Francisco Ordinances, landlords are required to pay

6   relocation expenses to tenants undergoing a no-fault eviction.  Tr. Ex. 13 at 10.  Under the

7   Ellis Act of 1985, Cal. Gov't Code §§ 7060-7060.7, government entities are restricted from

8   "compel[ling] the owner of any residential real property to offer, or to continue to offer,

9   accommodations in the property for rent or lease, except for guestrooms or efficiency units

10  within a residential hotel . . . ."  Cal. Gov't Code § 7060(a); Stip. Facts ¶¶ 7-8; Tr. Ex. 1 (dkt.

11  60-1).  But sections 7060.1-7060.1(c) go on to explain that "[n]otwithstanding Section 7060,

12  nothing in this chapter" . . . "[d]iminishes or enhances any power in any public entity to

13  mitigate any adverse impact on persons displaced by reason of the withdrawal from rent or

14  lease of any accommodations."  Stip. Facts ¶ 9.  San Francisco Administrative Code ("S.F.

15  Admin Code") implements this power in part by establishing procedures that rental property

16  owners must follow to withdraw their unit from the rental market.  Stip. Facts ¶¶ 10-11.  If

17  the property owner "wishes to withdraw from rent or lease all rental units within any

18  detached physical structure," the owner must first serve a Notice of Termination of Tenancy

19  on all tenants in possession of the unit.  Stip. Facts ¶ 10; S.F. Admin. Code § 37.9(a)(13).

20  The property owner must then file a Notice of Intent to Withdraw Rental Units with the San

21  Francisco Rent Board.  Stip. Facts ¶ 14; S.F. Admin. Code § 37.9A(f)(1).  A rental unit is

22  considered withdrawn from the market 120 days, or one year if the tenant is at least 62 years

23  old or disabled, after this Notice is filed with the Rent Board.  Stip. Facts ¶ 15; S.F. Admin.

24  Code § 37.9A(f)(4).  Once property owners have filed the Notice of Intent to Withdraw with

25  the Rent Board, they must withdraw their unit from the rental market unless the Rent Board

26  grants permission of rescission on the grounds that no tenant vacated or agreed to vacate the

27  property or that extraordinary circumstances exist.  Stip. Facts ¶ 18; Tr. Ex. 5 (dkt. 60-9).

28         A withdrawn unit is subject to strict limitations on re-rental.  Stip. Facts ¶¶ 22-26.  If

the property owner re-rents the unit within two years after withdrawal, the owner is subject to actual and exemplary damages to the displaced tenant and exemplary damages to the City. Stip. Facts ¶ 23; S.F. Admin. Code § 37.9A(d).  Between five and ten years after withdrawal, the property owner must first offer the unit to a displaced tenant who made a written request to be offered the unit.  Stip. Facts ¶ 24.  Regardless of who obtains a new lease, the rent must be no higher than the inflation index-adjusted amount the displaced tenant was paying.  Stip. Facts ¶ 24.  Within ten years, the withdrawn unit must be offered to a displaced tenant who has so requested.  Stip. Facts ¶ 25.

Most relevant for our purposes, the S.F. Admin. Code also establishes lump-sum payouts that a property owner must make to a tenant evicted under the Ellis Act.  Various amendments throughout the Ordinance's history adjusted inflation pegs for permissible rent increases and altered clauses that set income restrictions for tenants receiving relocation assistance.  Stip. Facts ¶¶ 27-30.  In 1994, the City amended its existing Ordinance to restrict payment only to displaced tenants who were low income, elderly, or disabled.  Stip. Facts ¶ 28.  The City removed any income restriction in a 2005 amendment, and added a clause that indexed payments to inflation.  Stip. Facts ¶ 30; Tr. Ex. 9 (dkts. 60-13, 60-14).  Although the amounts varied depending on unit size and whether the tenant was elderly or disabled, the required payment before 2014 was on the order of a few thousand dollars.  Stip. Facts ¶¶ 27-30.  Prior to the 2014 Ordinance challenged here, the extant payout requirement was governed by a 2005 Ordinance.  Stip. Facts ¶ 31.  The 2005 Ordinance required an inflation-pegged payment of $4,500 per tenant, up to $13,500 total per unit, plus an additional payment of $3,000 to any elderly or disabled tenant.  Stip. Facts ¶¶ 31-33; Tr. Ex. 9.[1]

On June 1, 2014, the City enacted San Francisco Ordinance No. 54-14, S.F. Admin. Code. § 37.9A(e)(3)(E), the subject of Plaintiffs' challenge.  Stip. Facts ¶ 34; Tr. Ex. 10 (dkts. 60-15, 60-16).  By its terms, the Ordinance's payment obligation applies to "[a]ny tenant who has received a notice of termination of tenancy, but who has not yet vacated the

---

[1]The current, inflation-adjusted payouts under the 2005 Ordinance are $5,265.10 base relocation amount, up to $15,795.27 per unit, plus $3,510.06 to each tenant who is disabled or 62 or older.  Tr. Ex. 4 (dkt. 60-8) at 8.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  unit by [June 1, 2014]"–including any tenant who received a Notice of Termination while the

2  prior ordinance was in effect but had not actually moved out when the 2014 Ordinance went

3  into effect.  Stip. Facts ¶¶ 41, 55, 60-61.  Under the 2014 Ordinance, the landlord must pay

4  the greater of the payout required by the 2005 Ordinance, or an amount equal to twenty-four

5  times the difference between the unit's current monthly rate and the fair market value of a

6  comparable unit in San Francisco, as calculated by a schedule developed by the Controller's

7  Office.  Stip. Facts ¶ 35.

8  The Schedule developed by the Controller's Office does not record or calculate actual

9  market rents in San Francisco, nor does it differ by neighborhood or unit size or

10  characteristics.  See Tr. Ex. 4 (dkt. 60-8) at 9.  Rather, it contains a single variable: a

11  multiplier, ranging from 0.710 for a tenant who moved into a unit in 2012 to 2.7155 for a

12  1979 or earlier move-in.  Id.  The lump-sum payout due to each tenant is calculated by

13  multiplying the unit's rental rate at the time the landlord files the Notice of Intent to

14  Withdraw, times the multiplier from the Schedule that corresponds with the year the tenancy

15  began, times twenty-four.  Stip. Facts ¶ 35.  This calculation purports to represent two years

16  of "Rental Payment Differential;" in other words, two years of the difference between the

17  tenant's current rent-controlled monthly rate and the market rate for a comparable unit.  Stip.

18  Facts ¶ 35.  Any tenant who qualifies as over age 62 or disabled also receives the additional

19  payment required by §§ 37.9A(e)(3)(C)-(D) of the 2005 Ordinance.  Stip. Facts ¶ 36.  One-

20  half of the payout is due at the time the property owner serves the Notice of Termination on

21  the tenant, and the remaining one-half is due when the tenant vacates the unit.  Stip. Facts ¶

22  35.

23  S.F. Admin. Code § 37.9(e)(3)(G)(i) allows a property owner to petition the Rent

24  Board for relief if the owner can prove that the payout required by the 2014 Ordinance would

25  "constitute an undue financial hardship for [the] landlord in light of all the resources

26  available to the landlord."  Stip. Facts ¶ 43.  The Rent Board can order a reduction or a

27  payment plan, and considers "all relevant factors," including the landlord's income and all

28  other assets except retirement accounts and non-liquid personal property.  Stip. Facts ¶¶ 43-

United States District Court
For the Northern District of California

45.  Another provision also provides a procedure for a property owner to present evidence to contest whether the rental payment differential calculated by the Controller's Schedule reasonably reflects the market rate for a comparable unit.  Stip. Facts ¶ 46; Tr. Ex. 12 (dkt. 60-18).  No evidence appears in the record about the standard, if any, that the Rent Board uses to evaluate a recalculation request.  See Stip. Facts ¶ 46; Tr. Ex. 12.  Neither plaintiff in the instant case contests the accuracy of the calculated payout in their facial challenge to the Ordinance, nor seeks a hardship adjustment.  Stip. Facts ¶¶ 63-64, 77.

        The payouts required by the 2014 Ordinance can be substantial, as illustrated by the plaintiffs in this case.  In 2008, the Levins purchased a home consisting of an upper and lower unit, each containing one bedroom.  Stip. Facts ¶ 51.  At the time of purchase, the lower unit was occupied by a tenant.  Stip. Facts ¶¶ 52.  The Levins moved into the upper unit of their home as their primary residence, and desired to occupy the lower unit as well. Stip. Facts ¶¶ 54-55.  On December 16, 2013, the Levins served a Notice of Termination of Tenancy on their tenant and filed a Notice of Intent to Withdraw with the Rent Board.  Stip. Facts ¶ 55; Tr. Ex. 22 (dkt. 60-28).  That same day, the Levins paid their tenant $2,605.46, which represented half of the tenant relocation payment required by the 2005 Ordinance. Stip. Facts ¶ 55.  The Levins' tenant subsequently claimed a disability, which automatically entitled the tenant to a one-year extension of termination date and an additional $3,473.93 payment under the 2005 Ordinance.  Stip. Facts ¶¶ 56-57.  The Levins did not contest the extension of the withdrawal date to December 16, 2014, and paid the additional disability payment.  Stip. Facts ¶¶ 56-57.  Because the tenant had not yet vacated the unit as of June 1, 2014, the Levins became subject to the new payment requirements of the 2014 Ordinance. Stip. Facts ¶¶ 60-61.  The Levins' tenant began renting in 1988 and pays a current monthly rental rate of $2,479.67.  Stip. Facts ¶ 62.  The Controller's Schedule provides a multiplier of 1.9821, which implies that according to the City's schedule, the rental differential between the tenant's rent and the market rent for a comparable unit is $4,914.95; in other words, the fair market value of a comparable unit is presumed to be $7,394.62 per month.  Stip. Facts ¶ 62; Tr. Ex. 4 at 9.  The rental differential multiplied by 24 means that the Levins are

required to pay their tenant $117,958.89 on the day the tenant vacates the unit.  Stip. Facts ¶ 62.  The Ordinance places no constraints on a tenant's use of the payout.  Stip. Facts ¶ 42.

The 2014 Ordinance contains no means or need test for the tenant, such that a tenant is entitled to the payout irrespective of income.  Id.  The ironic result of the Ordinance's formula is that those tenants who can afford to pay the highest current monthly rents are entitled to a correspondingly higher payout amount under the 2014 Ordinance.  An illustrative example is the situation faced by plaintiff Park Lane, which owns a thirty-three unit building in San Francisco that it seeks to withdraw from the rental market.  See Stip. Facts ¶ 65.[2]  The two tenants who moved into a Park Lane unit in 1997 and could afford to pay a monthly rent of $8,470.44 are now entitled to a payout of $223,782.25.  Stip. Facts ¶¶ 68, 75.  Another two tenants who moved in at around the same time, in 1998, but paid a monthly rent of $4,538.14, are now entitled to $110,516.14.  Stip. Facts ¶¶ 68, 75.  A single tenant who moved into a unit in 1981 and pays a monthly rent of $1,998.54 is now due $116,928.98.  Stip. Facts ¶¶ 68, 75.  These payouts are in addition to the funds Park Lane already paid out to any tenants who are over age 62 or disabled.  See Stip. Facts ¶¶ 71, 75.  In all, the 2014 Ordinance requires Park Lane to pay a total of more than one million dollars to the tenants in the thirteen units that remained occupied as of June 1, 2014.  Stip. Facts ¶¶ 74, 76.

## II.      DISCUSSION

### A.      Ripeness

As an initial matter, the City argues that Plaintiffs' takings challenge is unripe because Plaintiffs have not attempted to seek compensation in state courts.  The issue of ripeness presents a prudential concern, not a jurisdictional bar.  See Guggenheim v. City of Goleta, 638 F.3d 1111, 1117-18 (9th Cir. 2010).  But here, it is not even that.  The ripeness doctrine of Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172, 190

---

[2]On October 24, 2013, Park Lane filed a Notice of Intent to Withdraw and Notices of Termination of Tenancy on its tenant-occupied units.  Stip. Facts ¶ 67.  As of June 1, 2014, tenants in thirteen of Park Lane's units had not vacated the property, which subjected Park Lane to the 2014 Ordinance.  Stip. Facts ¶ 74.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  (1985), on which the City relies, does not apply to takings claims that do not seek monetary

2  compensation.  See San Remo Hotel, L.P. v. City & Cnty. of S.F., 545 U.S. 323, 345-46

3  (2005) (facial takings claims were instantly ripe "by their nature" because they "requested

4  relief distinct from the provision of 'just compensation'").  Plaintiffs here seek injunctive and

5  declaratory relief.  Moreover, takings claims that challenge a legislative demand for money,

6  like the one here, are ripe without a prior damages suit.  Eastern Enters. v. Apfel, 524 U.S.

7  498, 521 (1998) (ripeness not applicable where "the challenged statute, rather than burdening

8  real or physical property, requires a direct transfer of funds" mandated by government).  This

9  makes sense, as it would "entail an utterly pointless set of activities" to require a plaintiff to

10  pay money demanded by challenged legislation and then go seek one for one dollar

11  reimbursement before challenging the law as a taking.  See Student Loan Mktg. Ass'n v.

12  Riley, 104 F.3d 397, 401 (D.C. Cir. 1997).  The challenged Ordinance here requires a lump-

13  sum payment from property owner to tenant, one that by its very terms does not contemplate

14  compensation.  To the extent that there is any merit in the City's ripeness argument, these

15  considerations persuade the Court that it is appropriate as a prudential matter to adjudicate

16  Plaintiffs' claim at this time.  See Surf & Sand, LLC v. City of Capitola, 717 F. Supp. 2d

17  934, 938 (N.D. Cal. 2010).[3]

18  **B.  Constitutional Claim**

19       The Takings Clause of the Fifth Amendment to the United States Constitution, made

20  applicable to the states through the Fourteenth Amendment, Chicago, B. & Q.R. Co. v.

21

22       [3] The City argues in a nearly identical vein that "[e]quitable relief is not available to enjoin an
alleged taking of private property for a public use, duly authorized by law, when a suit for compensation
23  can be brought against the sovereign subsequent to the taking."  Trial Brief (dkt. 54) at 25 (quoting
Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016 (1984)).  Importantly, the quoted maxim "rests on
24  the principle that so long as compensation is available for those whose property is in fact taken, the
governmental action is not unconstitutional." United States v. Riverside Bayview Homes, Inc., 474 U.S.
25  121, 128 (1985) (citing Williamson Cnty., 473 U.S. at 190).  This does not prevent Plaintiffs from
seeking equitable relief under other circumstances, like those presented here, where the lump-sum
26  payment from property owner to tenant that the Ordinance requires neither provides nor sensibly
contemplates compensation. See Wash. Legal Fdn. v. Legal Fdn. of Wash., 271 F.3d 835, 850 (9th Cir.
27  2001) (citing Transohio Sav. Bank v. Director, Office of Thrift Supervision, 967 F.2d 598, 613 (D.C.
Cir. 1992) ("the district court should accept jurisdiction over takings claims for injunctive relief in the
28  few cases where a Claims Court remedy is so inadequate that the plaintiff would not be justly
compensated.") (citation omitted)).

United States District Court
For the Northern District of California

Chicago, 166 U.S. 226 (1897), provides: "[N]or shall private property be taken for public use, without just compensation."  This two-part test is often characterized as containing a "public use" requirement and a "just compensation" requirement.  Brown v. Legal Found. of Wash., 538 U.S. 216, 231-32 (2003).  "[I]f a government action is found to be impermissible–for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process–that is the end of the inquiry.  No amount of compensation can authorize such action."  Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 543 (2005).  But if the public use requirement is satisfied, the Court must determine whether a "taking" of constitutional dimension has occurred and, if so, whether the government provided just compensation.  Horne v. USDA, 750 F.3d 1128, 1136-37 (9th Cir. 2014) (citing Brown, 538 U.S. at 231-32, 235-36; and First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A., 482 U.S. 304, 314 (1987)).

1

Despite the largely unprecedented nature of the payment at issue here–a lump-sum payout from one private party to another–the Ordinance does not run afoul of the Public Use Clause.  "[A] taking should be upheld as consistent with the Public Use Clause as long as it is 'rationally related to a conceivable public purpose.'"  MHC Fin. Ltd. P'ship v. City of San Rafael, 714 F.3d 1118, 1129 (9th Cir. 2013).  "The concept of the public welfare is broad and inclusive," in "deference to legislative judgments in this field."  Kelo v. City of New London, 545 U.S. 469, 480-81 (2005) (citations omitted).  The City's stated purpose here is to mitigate the adverse effects of evictions and prevent the displacement of evicted tenants from San Francisco.  Although effectuating this purpose involves a one-to-one transfer of property, the benefit to individual private parties ostensibly serves a broader public purpose as determined by the City legislature.  See Kelo, 545 U.S. at 485-87.  Plaintiffs argue that the lack of restrictions on how a tenant spends the funds breaks any link between the City's stated purpose and the Ordinance's ability to enact it.  But the City rationally could have concluded that at least some tenants will use the payouts on housing and at least some will purchase housing in San Francisco, which on the margin will lessen displacement and

promote community stability. Because the "legislature's purpose is legitimate and its means are not irrational," see Kelo, 545 U.S. at 488, this Court must defer to the City's legislative judgment and concludes that the Ordinance satisfies the Public Use Clause.

2

Although the Ordinance is "rationally related to a conceivable public purpose," see MHC Fin., 714 F.3d at 1129, the Court must next determine whether the Ordinance effects a Fifth Amendment taking, and if so, of what type. Specifically, a claim that a government action is an uncompensated taking of private property may proceed under one of several legal theories. See Lingle, 544 U.S. at 548. The government action might be a "physical" taking, in which "the government physically takes possession of an interest in property for some public purpose," giving rise to a "categorical duty to compensate the former owner." Brown, 538 U.S. at 233-34 (citing, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982)). But this theory does not fit the Ordinance here, because "the government effects a physical taking only where it requires the landowner to submit to the physical occupation of his land." See Yee v. City of Escondido, 503 U.S. 519, 527 (1992); see also FCC v. Florida Power Corp., 480 U.S. 245 (1987) (rent control of utility poles not a physical taking under Loretto because utility companies can refuse to rent). Property owners subject to the 2014 Ordinance have the option of submitting to the payout requirement to regain control of their land, and thus have not suffered a physical taking.

A second category encompasses regulatory deprivations. A property owner can raise a claim under the "total regulatory taking" theory of Lucas v. S. C. Coastal Council, 505 U.S. 1003, 1020, 1026 (1992), in which the property owner alleges that a regulation has the effect of denying all "economically viable" use of his land. Where the argument instead is that a government regulation has diminished the value of property to an unconstitutional degree, the claim sounds in regulatory takings under the fact-specific factors of Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978). The Plaintiffs here do not allege that a regulation has decreased some or all of the value of their property such that the fact-intensive ad hoc inquiry of these takings theories come into play.

United States District Court
For the Northern District of California

Instead, the Ordinance at issue here requires that a property owner who wishes to withdraw a property apply to the City for an Ellis Act permit.  As a condition of granting the permit, the Ordinance mandates that the property owner pay any tenant who is evicted from the withdrawn unit the "enhanced" lump-sum payout, without which the tenant legally may continue to occupy the property.  A takings claim can proceed under a subset of the unconstitutional conditions doctrine by alleging that a land-use exaction violates the standards set forth in Nollan, 483 U.S. 825, and Dolan, 512 U.S. 374.  "Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right–here the right to receive just compensation when property is taken for a public use–in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property."  Dolan, 512 U.S. at 385.

The Nollan/Dolan line of cases "'involve a special application' of this doctrine," Koontz, 133 S. Ct. at 2594, in that they reviewed "Fifth Amendment takings challenges to adjudicative land-use exactions–specifically, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit."  Lingle, 544 U.S. at 546 (citing Dolan at 379-80 and Nollan at 828).  In other words, the doctrine comes into play when the government demands a private payment in exchange for granting a landowner permission to make a different use of her property.  "A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing."  Koontz, 133 S. Ct. at 2598 (citing Rumsfeld v. Forum for Academic & Inst. Rights, Inc., 547 U.S. 47, 59-60 (2006)).   "For that reason, [the Supreme Court] began [its] analysis in both Nollan and Dolan by observing that if the government had directly seized the easements it sought to obtain through the permitting process, it would have committed a per se taking."  Koontz, 133 S. Ct. at 2598-99 (citing Dolan at 384 and Nollan at 831).  "The question was whether the government could, without paying the compensation that would otherwise be required upon effecting such a taking, demand the easement as a condition for

granting a development permit the government was entitled to deny." <u>Lingle</u>, 544 U.S. at 546-47.

Nollan determined that the permit could be conditioned on the exaction only if the exaction had an "essential nexus" to the government interest that would furnish a valid ground for denial of the permit; "[i]n short, unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but 'an out-and-out plan of extortion.'" <u>Nollan</u>, 483 U.S. at 837 (citations omitted).  Dolan refined this requirement by explaining that there must be a "rough proportionality" "between the exactions imposed by the city and the projected impacts of the proposed development." <u>Dolan</u>, 512 U.S. at 377, 391.  "No precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." <u>Id.</u> at 391.  The burden is a significant one, in which "the city must make some effort to quantify its findings in support of the dedication . . . beyond the conclusory statement that it could offset some of the" development's negative impacts.  <u>Id.</u> at 395-96.

The critical conceptual link between <u>Nollan</u>/<u>Dolan</u> and the challenged Ordinance here comes from the recent Supreme Court decision in <u>Koontz</u>, 133 S. Ct. at 2594.  The Supreme Court first decided that the nexus requirements of <u>Nollan</u>/<u>Dolan</u> apply with equal force where a city <u>denies</u> an application to a petitioner who refuses to yield to the City's exaction condition.  <u>Koontz</u>, 133 S. Ct. at 2591.  But more importantly, the Court held that "so-called 'monetary exactions' must satisfy the nexus and rough proportionality requirements of <u>Nollan</u> and <u>Dolan</u>." <u>Id.</u> at 2599.  In <u>Koontz</u>, the City offered petitioner two options as a condition of granting a development permit: develop only 1 acre of the site and grant a conservation easement on the rest, or develop all 3.7 requested acres and perform "offsite mitigation," in which petitioner would fund improvements to a distinct parcel of city-owned property. <u>Id.</u> at 2598.  Unlike an untethered financial obligation, such as the retroactive obligation to pay medical benefits of retired miners at issue in <u>Eastern Enterprises</u>, 524 U.S. 498, the demand for money at issue in <u>Koontz</u> "'operate[d] upon . . . an identified property

1   interest' by directing the owner of a particular piece of property to make a monetary

2   payment." Id. at 2599.

3       In other words, "unlike [in] Eastern Enterprises, the monetary obligation burdened

4   petitioner's ownership of a specific parcel of land." Id. at 2599.  "The fulcrum [Koontz]

5   turns on is the direct link between the government's demand and a specific parcel of real

6   property." Id. at 2600.  "Because of that direct link, [the monetary exaction] implicate[d] the

7   central concern of Nollan and Dolan: the risk that the government may use its substantial

8   power and discretion in land-use permitting to pursue governmental ends that lack an

9   essential nexus and rough proportionality to the effects of the proposed new use of the

10  specific property at issue, thereby diminishing without justification the value of the

11  property." Id.

12      So too here.  The Nollan/Dolan rule governs the land use restriction challenged in the

13  instant case, in which a property owner wishing to make a different use of a

14  property–withdraw it from the rental market for sale or personal use–must apply to the City

15  for a permit to do so.  As a condition of granting the necessary Ellis Act permit, the

16  Ordinance requires a monetary exaction–a substantial payment, without which the property

17  owner's proposed new land use is denied and the tenant continues to occupy the unit.  As in

18  Koontz, where the monetary exaction was subject to a Nollan/Dolan analysis because the

19  City commanded a monetary payment "linked to a specific, identifiable property interest

20  such as a . . . parcel of real property," id., here the Ordinance's requirement of a monetary

21  payment is directly linked to a property owner's desire to change the use of a specific,

22  identifiable unit of property.  "Because of that direct link, this case implicates the central

23  concern of Nollan and Dolan" as acutely and in the same way as the traditional land-use

24  permitting context: the risk that San Francisco has used its substantial power under the Ellis

25  Act to pursue policy goals that lack an essential nexus and rough proportionality to the

26  effects of a property owner withdrawing a unit from the rental market.  See id.

27      Additional parallels persuade this Court that the Nollan/Dolan framework applies to

28  the Ordinance challenged here.  They are the same parallels that encouraged the Ninth

United States District Court
For the Northern District of California

1   Circuit to apply the Nollan/Dolan rule to a Marketing Order that required a certain

2   percentage of the raisin crop be diverted from the market.  Horne, 750 F.3d at 1142-43.  As

3   in Nollan, Dolan, and Horne, the challenged Ordinance requires a conditional exaction: the

4   loss of substantial funds or physical control over the landlord's unit.  See Horne, 750 F.3d at

5   1143.  All conditionally grant a government benefit in exchange for the exaction, which here

6   takes the form of the Ellis Act permit that the landlord must have in order to withdraw

7   property from the rental market.  See id. at 1143.  "And, critically, all" of these cases

8   "involve choice": the Nollans could have continued to lease their property with the existing

9   structure, Ms. Dolan could have left her store and parking lot unchanged, the Hornes could

10  have avoided the Marketing Order by planting different crops, and the Levins and Park Lane

11  can avoid paying the exaction by subjecting their property to continued occupation by an

12  unwanted tenant.  See id.[4]

13

14  _____

[4]      The City advances two arguments that procedural bars categorically disqualify a
Nollan/Dolan analysis from applying to this case: (1) that the framework cannot be applied in a facial
takings claim, and (2) that the framework does not apply to legislatively imposed exactions.  Neither
is persuasive.  The City relies on Garneau v. City of Seattle, 147 F.3d 802 (9th Cir. 1998), for the
principle that the Nollan/Dolan framework does not apply to facial takings claims, but the City's
position ignores the fact that Garneau's applicability is limited after Koontz, 133 S. Ct. 2586 (2013).
In Garneau, the Ninth Circuit reviewed a Seattle ordinance that required landlords to pay moving costs
of around $2,000 to low-income tenants displaced by property that was to be redeveloped.  Id. at 804.
Two judges on the panel affirmed the district court's grant of summary judgment to the City on the
facial takings claim.  Id. at 813.  In so doing, the court stated that "Dolan applies only to as-applied
takings challenges, not to facial takings challenges."  Id. at 811.  The majority in Garneau reached this
conclusion by reasoning that a facial challenge would require it to determine whether the amount of each
payment constituted a taking, an inquiry for which Nollan/Dolan provided no guidance and which was
incompatible with a facial challenge.  See id. at 811-12.  But Garneau is better understood as stating that
the facial challenge in that case was not amenable to a Nollan/Dolan analysis.  Garneau was decided
before Koontz explicitly extended the Nollan/Dolan framework to monetary exactions, and much of
Garneau's analysis relies on an assumed limitation to physical exactions that Koontz repudiated.  After
Koontz broadened the scope of Nollan/Dolan to monetary exactions, it opened up the applicability of
the rough proportionality test to the nature and terms, in addition to the amount, of the enhanced
payments the Ordinance requires here.
      The City's reliance on McClung v. City of Sumner, 548 F.3d 1219 (9th Cir. 2008) for the
argument that Nollan/Dolan does not apply to legislative conditions also is misplaced.  Koontz
abrogated McClung's holding that Nollan/Dolan does not apply to monetary exactions, which is
intertwined with and underlies McClung's assumptions about legislative conditions.  Koontz, 133 S. Ct.
at 2594.  And a very recent Ninth Circuit case reinforces the applicability of the Nollan/Dolan
framework to facial reviews of legislative exactions.  In Horne, 750 F.3d 1128, the Ninth Circuit
reviewed and rejected a takings challenge to a Marketing Order that required raisin producers to hold
back a certain amount of their crop from the market.  There, the Ninth Circuit reviewed whether the
Order satisfied the Nollan/Dolan essential nexus and rough proportionality tests.  Id. at 1143-44.  In so
doing, the court explained that Dolan's individualized review of a particular land-permit condition made

15

In line with <u>Nollan</u>, <u>Dolan</u>, and <u>Koontz</u>, Plaintiffs' complaint "does not ask us to hold that the government can commit a <u>regulatory</u> taking by directing someone to spend money." <u>See</u> <u>Koontz</u>, 133 S. Ct. at 2600.  Rather, Plaintiffs' claim relies, as it should, "on the more limited proposition that when the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, a '<u>per se</u> [takings] approach' is the proper mode of analysis under the Court's precedent." <u>See</u> <u>id.</u>

3

The Court turns, then, to evaluating under the <u>Nollan</u>/<u>Dolan</u> framework whether the payouts required by the Ordinance have an essential nexus with, and are roughly proportional to, the harm caused by a property owner's withdrawal of a unit from the rental market.  <u>See</u> <u>Koontz</u>, 133 S. Ct. at 2600.  The Ordinance on its face fails both the essential nexus and rough proportionality tests.  It requires that property owners seeking a permit to cease renting their property pay the evicted tenant an amount equal to two years' worth of the alleged gap between the reduced rent the tenant was paying the property owner and the market rent for a comparable unit.  In other words, according to the City, because the eviction is the but-for cause of the tenant being exposed to perhaps unaffordably high market rents, the property owner must pay for two years of that rent differential.

But the property owner's decision to repossess a unit did not cause the rent differential gap to which the tenant is now exposed.  Two variables, neither of which is attributable to the property owner, give rise to the rent gap differential.  One variable is the market rate.  The limited supply–and correspondingly high price–of rental units in San Francisco is, on the City's own evidence, caused by entrenched market forces and structural decisions made by the City long ago in the management of its housing stock.  <u>See, e.g.</u>, Tr. Ex. 16 at 12; Tr. Ex.

United States District Court<br>For the Northern District of California

---

sense there, because "in the land use context . . . the development of each parcel is considered on a case-by-case basis.  But here, the [raisin] use restriction is imposed evenly across the industry; all producers must contribute an equal percentage of their overall crop to the reserve pool." <u>Id.</u> at 1144.  The court went on to conclude that the Marketing Order was tailored to the government interests under <u>Nollan</u>/<u>Dolan</u> because it varied the reserve requirement annually in accordance with market conditions.  <u>Id.</u>

United States District Court
For the Northern District of California

13 at 2, 4.  The market effect of an Ellis Act withdrawal–indeed, of all Ellis Act withdrawals, which number on the order of a few dozen every year among a housing stock of hundreds of thousands of units–is infinitesimally small.  See Tr. Ex. 13 at 14.  The record shows that in 2013, for example, less than five one-hundredths of one percent of the City's rental housing stock was affected by an Ellis Act withdrawal.  See Tr. Ex. 13 at 6-7, 14.  On this record, it is indisputable that Ellis Act withdrawals do not cause high market prices.

The other variable is the regulated rent that the tenant currently enjoys.  This is, of course, a creature of regulation that the City imposes on the property owner as rent control.  Had the City regulated all rents or none, there would be no rent differential gap to which an evicted tenant would be exposed.[5]  Having chosen to regulate only some rents in the manner that it did, the City's rent control scheme results in many tenants, but not all, temporarily enjoying a lower-than-market rent.

Against the infinitesimally small impact of the withdrawal on the rent differential gap to which a tenant might now be exposed, the Ordinance requires an enormous payout untethered in both nature and amount to the social harm actually caused by the property owner's action.  Certainly, the rental unit's withdrawal from the market might cause a particular tenant to incur a number of expenses: packing costs, moving costs, the payment of a new security deposit, perhaps a need to take time off of work for the move, change of address expenses, and the like.  These expenses are comparable to the ones that satisfied the essential nexus test in Dolan, where reduced floodplain drainage was directly caused by the property owner's proposal to pave a much larger square footage of land–a direct link that nevertheless failed the rough proportionality test because the city failed to make an individualized showing that a public floodplain easement was sufficiently related to the development's impact on the city's interest in flood control.  See Dolan, 512 U.S. at 387,

---

[5]The City could have chosen to impose rent control on all units simultaneously and not to allow market rate adjustments at the commencement of a new tenancy, in which case there would be no rent gap differential upon eviction.  Alternately, the City could have abstained from controlling rents altogether, in which case all rents would be market rate, again doing away with a rent gap differential. The differential exists only because the City's regulatory framework consists of rent-controlled and market rents existing simultaneously.

United States District Court
For the Northern District of California

391.  But here, a property owners' withdrawal does not affect rents, and thereby causes none of the rent differential gap that the Ordinance requires the property owner to pay in full: as already explained, the rent-controlled lower rate the tenant currently enjoys is of the City's regulatory making, and the higher market rent the tenant might pay in the future is of the market's making.

This is the crucial distinction between the 2005 Ordinance and the 2014 Ordinance challenged here, and why the constitutional infirmity of the latter says nothing about the former.  The payments required by the 2005 Ordinance were, in both amount and intent, roughly proportional to the typical relocation costs that the property owner causes a tenant to incur by withdrawing a unit from the rental market.  The few thousand dollars required per tenant (and a correspondingly higher amount for the relocation of a multiple-tenant household) under the 2005 Ordinance approximates the expenses incurred in a typical relocation, which are the expenses caused by the property owner's withdrawal.

The 2014 Ordinance is altogether different.  Its stated intent is not to provide relocation assistance, but to force the property owner to pay for two years of a theoretical rental market differential to which the tenant might now be exposed.  The payout comes with no restrictions on how it is spent, no ability to ensure that the money be spent on housing or in San Francisco at all, and is not limited to low-income tenants whom the payout might persuade to stay in San Francisco–all factors that weigh against the City's ability to prove that the exaction "further[s] the end advanced as the justification" for the Ordinance, in satisfaction of the essential nexus test.[6]  Nollan, 483 U.S. at 837.  The City's "conclusory

_____

[6]The City's conjecture that some tenants likely will use the payout to purchase housing in San Francisco is insufficient.  See Dolan, 512 U.S. at 395-96.  Rather, it is incumbent on the City to "me[e]t its burden of demonstrating" that the Dolan test is satisfied by "mak[ing] some effort to quantify its findings" in support of the exaction's "rough proportionality" to the harm caused by the property owner's proposed change in land use.  Id. at 395-97, 402.  And it is no answer for the City to say that the Ordinance's purpose is fulfilled even with respect to tenants who use the payout for a purpose entirely unrelated to housing in San Francisco–to gamble in Las Vegas, say, or to buy housing in another state–because, the City argues, an efficient market means that the tenant has been compensated for the loss of the theoretical value of a rent-controlled unit in San Francisco.  The purely private benefit that inures with respect to those tenants has no link whatsoever to the public purposes articulated by the City in support of the Ordinance's permissibility under the Public Use Clause.  See Dolan, 512 U.S. at 386-87.

United States District Court
For the Northern District of California

statement[s]" that the payment "could offset some" of the withdrawal's negative impacts are insufficient to show proportionality. See Dolan, 512 U.S. at 395-96. But independently, and more fundamentally, the Ordinance fails on its face because it requires a monetary exaction that is not roughly proportional to–indeed, does not even share an essential nexus with–the impact of the property owner's proposed change in use. That is to say, it seeks to force the property owner to pay for a broad public problem not of the owner's making. See Koontz, 133 S. Ct. at 2600. A property owner did not cause the high market rent to which a tenant who chooses to stay in San Francisco might be exposed, nor cause the lower rent-controlled rate the tenant previously enjoyed. The Ordinance's constitutional infirmity being one inherent in the nature of what the monetary exaction is intended to recompense–a dislocation that necessarily arises in all of the Ordinance's applications–it fails on its face to survive Fifth Amendment scrutiny. See United States v. Salerno, 481 U.S. 739, 745 (1987) (The challenger in a facial suit "must establish that no set of circumstances exists under which the Act would be valid."); Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008) (same).

The City maintains that the payout satisfies the essential nexus and rough proportionality tests because the property owner's withdrawal of a unit from the housing market "causes" the evicted tenant to be exposed to market rents. But this private benefit/loss analysis fails to offer an escape from the just compensation clause. The City seeks to have its cake and eat it too, looking to the Ordinance's stated public purposes to satisfy the Public Use Clause but looking only to an individual tenant's private circumstance to satisfy rough proportionality. This defies the Nollan/Dolan test, which looks to the relationship "between the property that the government demands and the social costs of the applicant's proposal." Koontz, 133 S. Ct. at 2595. The property owner's withdrawal causes the tenant to incur certain immediate moving expenses. But as previously discussed, it does not cause either variable of the rent gap differential.

Were the City's literal reading correct–that the property owner's personal use of a property "causes" a tenant to face high market rents–there would be no principled reason

19

United States District Court
For the Northern District of California

1    under the Fifth Amendment to limit the exaction to two years instead of ten, or a lifetime.

2    This is not a matter of the Court second-guessing legislative line drawing, nor of the City's

3    beneficence in requiring a less onerous exaction than it might otherwise have.  In basing its

4    payments on a rent gap differential, the nature of the exaction here does not purport to have a

5    nexus with anything the property owner actually caused, but rather with market forces

6    unrelated to the impact of the property owner's use of the property.  See Dolan, 512 U.S. at

7    386.  "The absence of a nexus" leaves the City "in the position of simply trying to obtain"

8    tenant public assistance at the owner's expense, without compensation from the government.

9    See Dolan, 512 U.S. at 387 (citing Nollan, 483 U.S. at 837).

10          For these reasons, it is of no import that in approximately twenty percent of Ellis Act

11   withdrawals, the dollar amount of the payment due under the 2014 Ordinance is not higher

12   than the amount due under the 2005 Ordinance.  Those instances occur because the tenant

13   moved into the unit so recently that the alleged rental market differential the tenant might

14   face upon eviction is minimal.  But this Court's analysis on a facial challenge does not

15   depend on the dollar amount due in any individual case.  The Court's decision no more relies

16   on sticker shock over the hundreds of thousands, or millions, of dollars owed by the plaintiffs

17   here than on lower amounts that some other property owners might be required to pay.

18   Rather, Nollan, Dolan, and Koontz instruct this Court to look to whether the monetary

19   exaction "is related both in nature and extent to the impact of the proposed" new use of the

20   property.  See Dolan, 512 U.S. at 391 (emphasis added).  In every instance, the Ordinance

21   imposes on property owners a rent differential payment–of whatever size–that is by nature

22   unrelated to the impact of the property owner's repossession.  And in eighty percent of cases,

23   the enormous payouts required by the Ordinance do not even bear a numerical relationship to

24   the relocation costs that are causally linked to the property owner.  "Extortionate demands for

25   property in the land-use permitting context run afoul of the Takings Clause not because they

26   take property but because they impermissibly burden the right not to have property taken

27   without just compensation."  Koontz, 133 S. Ct. at 2596.

28          The City seeks to escape this analysis altogether by proposing that the Ordinance is

20

just rent control in disguise; specifically, that it operates as "prospective" rent control, in which the property owner must pay as a lump sum now the same amount it would have lost, relative to market rates, had the tenant occupied the unit for the next two years at a rent controlled rate.  It being black letter law that rent control is not a taking, the City reasons, this "prospective" rent control enjoys the same constitutionality.

This contention is as ungrounded in law as it is bizarre.  Rent control reduces landlords' income by regulating the price increases they may charge if they choose to participate in the rental market.  The Supreme Court has affirmed that States have broad power to regulate housing conditions in general and "place ceilings on the rents the landowner can charge . . . without automatically having to pay compensation."  Yee, 503 U.S. at 529.  But a "different case would be presented were [a] statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy."  Yee, 503 U.S. at 528.  A property owner has the right, under the Ellis Act and likely under the Constitution, to cease being a landlord. See Cal. Gov't Code § 7060(a).  By evicting a rent-controlled tenant, the property owner no longer is subject to rent control.  Moreover, there is no legal or logical authority for the proposition that a government's ability to regulate market prices implies an authority to require an affirmative lump-sum payment.  The Ordinance "is not a rent control law for the simple reason that it is not designed to–nor does it–control rents.  It does not just miss the mark because of unintended consequences or inefficient administration.  Its very structure was designed and intended not to provide housing rent control, but to transfer wealth" from Ellis Act property owners to evicted tenants.  See Guggenheim, 638 F.3d at 1124 (Bea, J., dissenting).  The Levins knew at the time of purchase that their property was subject to rent control, such that their annual increases in rent and ability to evict a tenant without cause would be limited.  But the Ordinance retroactively requires them to pull from their pockets a huge lump-sum amount–in their case, roughly equivalent to a refund of two months of rent for every year the tenant occupied the property, starting long before they purchased it–that shares none of the features of rent control upheld by the courts.

United States District Court
For the Northern District of California

1   The City's alternate escape route is shut for the same reason.  The City rightly notes

2   that Nollan and Dolan were predicated on the government demanding, in exchange for a

3   permit or benefit, an exaction it could not compel directly.  See Dolan, 512 U.S. at 384;

4   Nollan, 483 U.S. at 831.  In other words, a "predicate for any unconstitutional conditions

5   claim is that the government could not have constitutionally ordered the person asserting the

6   claim to do what it attempted to pressure that person into doing." Koontz, 133 S. Ct. at 2598.

7   The City uses this to posit that because the City can compel a landlord to charge a rent-

8   controlled rate, it can compel landlords to pay the same benefit to the tenant in cash.  But as

9   discussed above, the Ordinance neither shares any of the features of, nor is intended to

10   function as, rent control.  The City has no authority to require property owners to remain in

11   the rental market and thus be subject to rent-control losses, nor to seize the property owners'

12   funds to ameliorate this or any other perceived social ill.[7]  So instead, the City has

13   conditioned the payout on the property owners' intent to exercise one of their most essential

14   property rights–the right of possession, to the exclusion of others–thereby invoking the rough

15   proportionality test designed for this very context.  See Kaiser Aetna v. United States, 444

16   U.S. 164, 176 (1979).

17       In the end, this Court concludes that the Ordinance is a monetary exaction that

18   "lack[s] an essential nexus and rough proportionality to the effects of the proposed new use

19   of the specific property at issue." See Koontz, 133 S. Ct. at 2600.  The Ordinance does so on

20   its face, because the explicit purpose of the statute is to approximate a rent differential sum

21   that is neither caused by nor related to the impact of property owners' decisions to exercise

---

23   [7]It is no answer for the City to speculate that a counterfactual alternate ordinance could have

24   forced property owners to pay similar funds by, say, imposing a tax pegged to a certain percentage of
    the property's value as a condition of an Ellis Act withdrawal.  The Supreme Court has "repeatedly
    found takings where the government, by confiscating financial obligations, achieved a result that could

25   have been obtained by imposing a tax." Koontz, 133 S. Ct. at 2601.  The functional overlap between
    the two "is not a creature of [Koontz's] . . . holding that monetary exactions are subject to scrutiny under

26   Nollan and Dolan," but "[r]ather, the problem is inherent in [the Supreme] Court's long-settled view that
    property the government could constitutionally demand through its taxing power can also be taken by

27   eminent domain." Id.  Moreover, "teasing out the difference between taxes and takings is more difficult
    in theory than in practice," and the specter of taxation plays no role in review of property not taken as

28   such. Id. at 2601-02.  No party contends that the Ordinance payment challenged here is a tax, and the
    Court makes no determination on that issue.

1   the right to regain possession of their parcels.  By its very terms, like other government

2   demands of the "relinquishment of funds linked to a specific, identifiable property interest,"

3   the Ordinance neither pays nor contemplates just compensation.  See Koontz, 133 S. Ct. at

4   2600.  The Ordinance thus does not pass constitutional muster.

5   **III.   CONCLUSION**

6         San Francisco's housing shortage and the high market rates that result are significant

7   problems of public concern, and the City legislature's attempts to ameliorate them are

8   laudable.  "[B]ut there are outer limits to how this may be done.  A strong public desire to

9   improve the public condition [will not] warrant achieving the desire by a shorter cut than the

10  constitutional way of paying for the change."  Dolan, 512 U.S. at 396 (quotations omitted).

11  The Constitution prohibits the City from taking the policy shortcut it has taken here, in which

12  the City seeks to "forc[e] some people alone to bear public burdens which, in all fairness and

13  justice, should be borne by the public as a whole."  Id. at 384 (quoting Armstrong v. United

14  States, 364 U.S. 40, 49 (1960)).  The Ordinance apparently is unprecedented in requiring a

15  massive lump-sum payout from one private party to another in exchange for regaining

16  possession of property.[8]  But that trail had not been blazed before for good reason.  In so

17  doing, the City has crossed the constitutional line between permissible government

18  regulation of land and an impermissible monetary exaction that lacks an essential nexus and

19

20         [8] The Court and the parties are unable to find any ordinance, anywhere, that does what San
    Francisco has attempted to do here.  The City analogizes instead to rent control regulations, and

21  relocation payments that reimburse a displaced tenant for moving expenses, and, oddly, benefits paid
    by state and federal government entities to displaced tenants.  For reasons already discussed, none of

22  these raise the Takings Clause issues of the challenged Ordinance here.  The City also maintains,
    erroneously, that San Remo Hotel L.P. v. City and County of San Francisco, 27 Cal. 4th 643, 651

23  (2002), is instructive here.  That case denied a facial challenge to San Francisco's Residential Hotel Unit
    Conversion and Demolition Ordinance ("HCO"), S.F., Cal., Admin. Code ch. 41 (1990).  Id. at 649.

24  But the HCO is markedly different from the Ordinance at issue here because it involved the conversion
    of commercial hotel properties from one type of commercial hotel to another, and the payments at issue

25  there were made to a city housing fund, not paid directly to displaced tenants.  See id. at 650-51, 668.
    In any event, the California Supreme Court in San Remo Hotel reviewed a takings claim under the

26  California Constitution, and the case involved potential preemption issues not before this Court.  See
    id. at 643, 649.  Neither the Ninth Circuit nor the Supreme Court reviewed the Fifth Amendment

27  propriety of the HCO.  See San Remo Hotel, 545 U.S. at 347 (holding that the full faith and credit clause
    applies to litigants seeking to advance federal takings claims); San Remo Hotel v. City and Cty. of S.F.,

28  145 F.3d 1095, 1098 (9th Cir. 1998) (declining to resolve the constitutionality of the HCO due to
    procedural issues); San Remo Hotel v. City and Cty. of S.F., 364 F.3d 1088, 1090 (9th Cir. 2004)
    (deciding the case on grounds of issue preclusion).

rough proportionality to the impact of an Ellis Act withdrawal. For these reasons, the Court GRANTS declaratory and injunctive relief from the Ordinance as a taking without just compensation in violation of the Fifth Amendment to the United States Constitution. This decision is hereby STAYED until October 24, 2014, to allow the City to seek any relief to which it is entitled in the Ninth Circuit.

**IT IS SO ORDERED.**

Dated: October 21, 2014

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE